[No. S004614. Crim. No. 23721. Nov. 3, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES EDWARD MOORE, JR., Defendant and Appellant.

[Crim. Nos. 24849, 25087, 25921. Nov. 3, 1988.]

In re CHARLES EDWARD MOORE, JR., on Habeas Corpus.

64

68

70

---

**COUNSEL**

Keith C. Monroe, under appointment by the Supreme Court, and Daniel D. Zahner for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Norman H. Sokolow, John R. Gorey, Donald E. De Nicola, Gary R. Hahn and Ivy K. Kessel, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LUCAS, C. J.**—Defendant Charles Edward Moore, Jr., appeals from a judgment imposing the death penalty following his conviction of two counts of first degree murder under the 1977 death penalty law (former Pen. Code, § 187 et seq.; all further statutory references are to this code unless otherwise indicated), two counts of robbery (§ 211), one count of burglary (§ 459), accompanied by six special circumstance findings, two each of robbery-murder, burglary-murder and multiple murder (former § 190.2, subd. (c)(3)(i), (c)(3)(v) & (c)(5)), with various weapon-use and great bodily injury enhancements (§§ 12022.5, 12022.7 & 12022, subd. (b)). We have consolidated defendant's three petitions for writs of habeas corpus with the appeal. As will appear, we affirm the judgment in its entirety and deny the habeas corpus petitions.

### I. FACTS AND PROCEDURE

#### A. *Guilt Phase Evidence*

The case against defendant was based almost entirely on the testimony of Terry Avery, who was granted immunity from prosecution in exchange for her testimony. Avery's testimony was substantially corroborated by physical evidence and expert witnesses.

In late November 1977, defendant coaxed Avery, while still a minor, to leave her parents' Denver, Colorado, home and travel with defendant and Lee Edward Harris to Lawrence, Kansas. In Lawrence, Avery, defendant and Harris attempted to rob a Woolworth's store where defendant had been previously employed. As they left the store, defendant grabbed the manager, Norwood. Harris forced Norwood into the backseat of the car, hit him on the head with a gun and demanded information about money in the store. Harris then ordered Norwood to disclose the location of the store safe and searched Norwood's wallet for the safe's combination. When Harris found the combination, Norwood said he would help open the safe and that he wanted only to get home to his son's birthday party. While Norwood begged for his life, defendant directed Harris to drive to a deserted part of

town near some railroad tracks, where defendant shot and killed Norwood, and took his wallet.

Thereafter, the trio traveled by bus to Southern California in order to rob the managers (Mr. and Mrs. Crumb) of an apartment complex on Broadway Avenue in Long Beach where defendant formerly resided. They checked into the Kona Hotel in Long Beach. Avery and defendant registered as Mr. and Mrs. Charles Brown, and Harris gave his name as Sam Harris.

That same evening, the three entered the Broadway Avenue complex by following James Jones, a tenant, through the front security door before it closed and locked. Both defendant and Harris were armed with pistols and, according to Avery, one of the men had a roll of adhesive tape. Avery knocked on the Crumbs' door, and defendant pushed his way into the apartment when Mrs. Crumb opened the door.

After tying up the Crumbs, and gagging and beating them, defendant hit Mr. Crumb in the head with the butt of a gun and demanded money from both victims. Defendant then instructed Avery to search the bedroom for jewelry. Avery found a jewelry case, and took the jewelry (which included rings, watches, belt buckles and necklaces), placing the items in a cloth sack. Defendant removed several items of jewelry from the victims, and placed them in the same sack.

Thereafter, defendant and Harris instructed Avery to go to the kitchen and try to find some knives She did so and pretended to be unable to find any. Harris went into the kitchen and returned with a large butcher knife. Avery retreated to the bedroom, and after waiting "a few minutes," peered out and saw defendant stabbing Mr. Crumb while Harris held the victim's legs. Harris then instructed Avery to stab Mrs. Crumb with a pocketknife that was on the coffee table.[1] Avery did as she was told, stabbing Mrs. Crumb near her armpit. Avery then left the apartment while defendant and Harris remained behind. Both Mr. and Mrs. Crumb died in the attack.

Ten minutes later, defendant and Harris left the apartment and all three returned to the Kona Hotel. There they examined the jewelry, and gave Avery some rings for her participation in the robbery. Defendant and Harris each took some watches, and placed the remainder of the loot in a yellow plastic shoe bag obtained from a store in Lawrence, Kansas, bearing the

---

[1] When Avery touched the coffee table with her fingers, Harris yelled at her to wipe off the table to avoid leaving fingerprints. Avery testified that while she was in the apartment, precautions were taken by the trio to assure no fingerprints were left behind.

name "Arensberg's Shoes." A few days later, Avery left defendant and Harris in Long Beach, and returned to Denver by bus.

Three or four days after she arrived in Denver, Avery saw defendant and Harris, first in Inglewood and next in Littleton, Colorado, both Denver suburbs. Avery subsequently confessed to her mother her involvement in both the Norwood and Crumb murders. Avery's mother called the Denver police, and Avery voluntarily surrendered to the authorities when they arrived at her mother's home and placed Avery under arrest. On the evening of her arrest, Avery told police about the Norwood murder in Kansas. Thereafter, Avery identified defendant and Harris in a photographic show-up, and told the authorities that defendant and Harris could be found at an apartment complex located on West Belleview Street in Littleton.

Based on the above information, the Denver officers subsequently secured an arrest warrant and then proceeded to the Belleview Street apartment. They arrested Harris and defendant, who attempted to escape through a bedroom window. In plain view, the officers found the "Arensberg's Shoes" bag containing numerous articles of jewelry belonging to the Crumbs. A gun was found on the floor next to where defendant was arrested. Defendant and Harris were wearing two rings taken during the Crumb robbery murder.

The next morning, Avery was released to Kansas authorities. One week later, she discussed with Detective Collette, of the Long Beach Police Department, the facts surrounding the Crumb murders. Avery admitted her participation in the attack. At the request of her attorney, Avery was granted complete immunity for her involvement in the Crumb murders in return for her testimony.

At trial, defendant testified on his own behalf. He conceded he had planned the robbery of the Crumbs and showed Avery and Harris where the Crumbs lived, but stated that he remained at the Kona Hotel while Avery and Harris robbed and murdered the Crumbs. Defendant presented no other witnesses at the guilt phase.

B. *Penalty Phase Evidence*

The penalty phase of the trial lasted six days. Defendant again testified on his own behalf. He told the jury that he had "found the Lord" and asked for mercy. Defendant also presented six witnesses, including his three brothers and a sister who testified about defendant's childhood in their broken family. According to Milton Moore (defendant's brother), defendant's mother moved to California with one of his brothers when defendant was eight

years old. Thereafter, defendant lived with his father, who had a severe drinking and gambling problem. All of the boys shared beds and slept in the basement. The father punished the children by whipping them and locking them in a small room in the basement, and he generally provided them with inadequate food and clothing. He also directed the children to steal automobile parts, hot water heaters and washing machine parts from neighbors' yards. Defendant, whose mother was White and whose father was Black, was often teased by other children for being a "half-breed."

Michael Maloney, who holds a Ph.D. in clinical psychology, testified that he examined defendant and concluded defendant committed the murders because of the environment in which he was raised. Specifically, Maloney described defendant as a "sociopath" and explained that he suffered from a "mixed personality disorder" stemming from early childhood training in stealing. Wayne Downs, a deputy sheriff for the County of Los Angeles, testified that defendant had behaved properly while in custody awaiting trial.

Four witnesses testified for the prosecution. Deputy Sheriff Reilhan from Littleton, Colorado, testified that in July 1979, defendant escaped while Reilhan was transporting him to court in Aurora, Colorado. Defendant was captured a block away the same day. James Peters, a chief deputy district attorney in Colorado, testified that he successfully prosecuted defendant in 1980 for the crimes of escape and aggravated robbery. Avery testified that defendant robbed the Lawrence, Kansas, Woolworth's store and shot Norwood, the store manager, four times at point-blank range after kidnapping him. In related testimony, Michael Malone (the district attorney who prosecuted the Norwood robbery-murder), stated that defendant was found guilty in 1979 in Kansas of kidnapping, aggravated robbery and first degree murder in the Norwood incident.

## II. PRETRIAL MOTIONS

██ ██ Defendant contends the trial court erred in failing to substitute counsel, or in the alternative, appoint additional counsel to assist trial counsel. ██ He also complains that the court erred by denying his request to proceed in propria persona. Defendant asserts that each error requires reversal of the entire judgment.

The record shows that before trial, defendant sent a letter to the court postmarked March 12, 1984, stating his dissatisfaction with defense counsel.[2] Four days later, at a hearing to determine whether defendant was

[2] The letter stated that "I've been asking my lawyer [Slick] if I can go cocounsel for about four months. He keeps saying he will think about it. [¶] I went to court on March 5, 1984.

receiving effective assistance of counsel, the court interpreted defendant's letter as alternative requests for substitution of counsel, additional counsel to assist defense counsel, cocounsel status, and as a request to proceed in propria persona with advisory counsel. We address each of these issues separately.

## A. *Marsden Motion*

 During the hearing on defendant's request for substitution of counsel, the court questioned defense counsel regarding his trial preparation and, in particular, focused on counsel's difficulty in locating Jones, the tenant who had opened the security door to the Broadway apartment complex where the Crumbs resided, thus allowing defendant, Avery and Harris to enter.[3]

---

Prior to going in the courtroom I talked to my lawyer. My lawyer said he was ready for trial. I asked him if he talked to the witness that I had told him about. He said he hadn't but he had access to the witness and he could talk to the witness anytime. I asked him about a few other items that I had talked to him and the investigator about. He acted like he didn't know what I was talking about. [¶] At this point I asked about cocounsel. I said I wanted to work with him on my case to make sure my defen[s]e was prepared properly. He said he didn't want me to go cocounsel and asked if I wanted to go pro. per. When I said I did, he said you would not let me. I said I would ask the court anyway. He got mad and left. [¶] I waited all day to go to court. At about 4:30 my lawyer told me he had my case postponed until March 9, 1984. [¶] On March 9, 1984, I went to court and my lawyer told me he had my case postponed again. [¶] Both times my case was postponed without me being in court. I was in the holding tank. This violated my constitutional right under the Sixth Amendment 'right to presence.' . . . [¶] I believed he had my case postponed without me being there because he didn't want me to notify the court that I wanted to go cocounsel or pro. per. [¶] This enhances my belief that my lawyer is not representing me to the best of his ability. [¶] I ask that the court see to it that I am present at all court procedures. [¶] I ask that the court appoint me cocounsel with another lawyer or allow me to go pro. per., which is my constitutional right of 'self-representation' under the Sixth Amendment. . . ."

[3] Defense counsel informed the court: "A week ago, and it's been only a week ago that I've been able to locate this fellow, it was my feeling, and what I talked to Mr. Moore about, is that he is a good People's witness. I have felt all along that he's a good witness for the People; but I felt that he's a bad witness for the defendant. I have located him. I've sent my investigator to talk to him. I have not heard back from him since that time. And the person who helped me find him—and my investigator was unable to do so—was Bill Collette of the Long Beach Police Department. He was able to go out and find that fellow for me and make him available to me [¶] I have since learned that this man will be called by the District Attorney's office; and we, of course would be able to use whatever—whatever evidentiary value we can out of part of his testimony. But I felt in balance, and I'm probably going to be proved right, that he's going to hurt more than he helps. . . . [¶] THE COURT: Well, apparently Mr. Slick told me he's tried to find this man, and he's been very [e]lusive but he now has him; and he either has or will talk to them. And also the People are going to produce this man as a witness on behalf of the People. Now, common sense tells me that Mr. Jones isn't going to help you very much. But the bottom line is that Mr. Slick has this witness identified; he's in the process of trying to figure out what it is that this witness can testify to that's going to be helpful to you; and he will be here for whatever testimony can be of assistance to you. . . ."

The record indicates that the court then inquired further into defendant's complaints concerning counsel's preparation. Defendant's claims focused on counsel's defense strategy, including a fear that counsel would not cross-examine Avery during trial and would not discuss the merits of certain pretrial motions, including a motion to suppress evidence under section 1538.5. After considering defendant's grievances, the court concluded that defense counsel had adequately prepared the case for trial and denied defendant's motion for substitution of counsel. (*People* v. *Marsden* (1970) 2 Cal.3d 118, 124 [84 Cal.Rptr. 156, 465 P.2d 44].)

■ We have consistently held that the "decision to allow a substitution of attorney is within the discretion of the trial judge 'unless there is sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his present request was denied . . . .'" (*People* v. *Smith* (1985) 38 Cal.3d 945, 956 [216 Cal.Rptr. 98, 702 P.2d 180], quoting *People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].) In *Marsden, supra,* 2 Cal.3d at pages 124-125, we held that in ruling on a motion for substitution of counsel, the court must allow defendant an opportunity to enumerate specific examples of inadequate representation. We determined in *Marsden* that the trial court there had abused its discretion by refusing to listen to the reasons for which defendant had requested substitution of counsel.

■ By contrast, the court here specifically requested defendant to state the reasons why he was dissatisfied with his counsel's trial preparation. Likewise, the record shows the court exercised extreme care in considering defendant's reasons for requesting substitution of counsel, and asked thoughtful follow-up questions before properly finding that defendant's concerns were either unsubstantiated or insufficient to justify the appointment of new counsel. Accordingly, the *Marsden* motion was properly denied.

B. *Keenan Motion*

■ The decision whether to grant a defendant's motion for the appointment of a second attorney in a capital case also rests within the sound discretion of the trial court. (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430, 434 [180 Cal.Rptr. 489, 640 P.2d 108]; § 987, subd. (d).) In *Keenan* we recognized that in a death penalty case, where the legal and factual issues were complex, other criminal acts were alleged, there were a large number of witnesses, complicated scientific and psychiatric testimony was anticipated, and extensive pretrial motions would be made (*id.*, at p. 434), the court may grant defendant's motion for a second counsel. ■ After reviewing the record, we are satisfied the court exercised proper discretion in denying defendant's *Keenan* motion. Defendant never

argued any specific or compelling reasons requiring the assistance of additional counsel. Accordingly, no error occurred in denying the *Keenan* request. (See *People v. Jackson* (1980) 28 Cal.3d 264, 288 [168 Cal.Rptr. 603, 618 P.2d 149].)

### C. *Request for Cocounsel Status*

■ Similarly, we believe the court properly considered and denied defendant's request for cocounsel status. It is unclear from the record whether defendant, in fact, wanted to act as cocounsel.

The record discloses defendant's confusion regarding his desire to act as cocounsel: "THE COURT: I'd like you to tell me what you have in mind when you say you want to go cocounsel. [¶] THE DEFENDANT: Okay. I've been—I don't know if it's in the record;—but I've been—I have about three or four cases on top of this case in Colorado and Kansas. [¶] THE COURT: Yes. Keep your voice up. [¶] THE DEFENDANT: And each time I went to trial, I think my lawyers didn't represent me properly; and I think in order for me to get a proper defense, in order to get the lawyers to do what I say and what I feel are right on the things that I'm doing in my court procedures and trials and stuff, that I have to be in a position in order to, you know, ask them about things and tell them, you know, make sure that they do the things that ask them to do. [¶] But because if I'm not cocounsel, or if I'm not in a position where I can represent myself, they're not obligated to what I asked them to do. In the past they have—did—you know, things in trial procedures that, you know, that I asked them not to do; they didn't do things that I had asked them to do; and they lied to me about evidence; and they lied to me about different things in my trials. [¶] And as of this point I don't trust most attorneys, because of the fact that I have been convicted three times, you know; because of attorneys didn't represent me properly. . . . [¶] THE COURT: . . . I think what you might be talking about is what we call stand-by counsel, which is where you are appointed to represent yourself and then you use what they call stand-by counsel. But I don't see the need for that. . . . [¶] THE DEFENDANT: Okay." Defendant's responses to the court's inquiries revealed he wished to retain control over tactical decisions that usually would be made exclusively by primary counsel. It appears, therefore, that defendant sought not cocounsel status, but primary counsel status.

Even if we were to find the court's disposition of defendant's inquiry here amounted to a denial of cocounsel status, we would find no error. ■ A defendant has no absolute right to participate in the presentation of his case when he is represented by counsel. (*People v. Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937].) Indeed, the decision whether to confer on a defendant

cocounsel status is within the sound discretion of the trial court which "should not permit a litigant both to have counsel and to actively participate in the conduct of the case . . . unless the court on a substantial showing determines that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (*Id.*, at p. 797.)

After reviewing the record, we fail to find defendant made the requisite "substantial showing" contemplated by *Mattson, supra,* 51 Cal.2d at page 797. Accordingly, we believe the trial court exercised proper discretion in refusing to grant him cocounsel status.

### D. *Faretta Motion*

On Monday morning, March 19, 1984, the court continued the hearing on defendant's previously discussed motions to consider his alternative request to proceed in propria persona. At that time, the court ordered defendant's petition to proceed in propria persona filed but informed defendant that because the trial was set to begin that afternoon, it would deny his motion unless he was prepared to begin trial the same day. The prosecution stressed that although it had no objection to defendant proceeding in propria persona as long as he was "ready to proceed," any continuance of the matter would result in extreme hardship to the out-of-state prosecution witnesses. After defendant stated, "I couldn't go to trial this afternoon, but I would request the Court that if I go pro. per. to give me time to prepare my defense," the court denied defendant's motion for the following reasons: "The Court: Number one, that it would interfere with the orderly administration of justice to continue this case. This court as the Master Calendar Court will state for the record that we have geared the handling of criminal and civil calendar matters in this court to make sure that an open courtroom would be available for the trial of the People versus Moore matter. [¶] Mr. Slick [defense counsel] answered ready apparently on the 5th of March, that was the 44th of 60 days, the courtrooms here don't come up all that rapidly, and I am not sure we could get this matter out if it is not sent out promptly to the courtroom that is being held in readiness to accept it. [¶] Number two, we do have out-of-state witnesses who have given up their plans and rearranged their lives to come out and testify in this matter. [¶] Number three, Mr. Slick has announced ready, is ready. [¶] And fourthly, the defendant is unwilling to go to trial forthwith if the court would grant him pro. per. status."

Initially, we note that although the court filed defendant's request to proceed in propria persona on March 19, the day trial was to begin, defend-

ant actually made the oral request on March 16. Apparently, defendant planned not to request to represent himself if the court granted his motion under *Marsden, supra,* 2 Cal.3d 118. Accordingly, we will treat defendant's motion under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], as having been made on Friday, March 16. (*People* v. *Ruiz* (1983) 142 Cal.App.3d 780, 789 [191 Cal.Rptr. 249].)

■ In *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], we held that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. . . . Accordingly, when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*Id.,* at pp. 127-128.) *Windham* however, did not purport to allow a defendant to unnecessarily delay trial under the pretense of a *Faretta* motion. Indeed, we specifically stated in *Windham,* that "a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court. . . ." (*Windham, supra,* 19 Cal.3d at p. 128, fn. 5.) ■ On close examination, we believe the court was correct in denying the *Faretta* motion.

■ In a related argument, defendant asks us to alternatively deem his *Faretta* motion made on March 5, 1984, rather than on March 16, 1984. In this regard, he points to the letter he sent to the court on March 12, 1984 (*ante,* at p. 74, fn. 2) that refers to a conversation which allegedly took place between defendant and his counsel on March 5, 1984, during which defendant told his counsel he wanted to represent himself.[4]

Defendant's argument is misplaced. The court first became aware of defendant's request when it received his March 12 letter. The court promptly held a hearing to determine what defendant was requesting with regard to counsel, a subject not readily apparent from the letter. (*Ante,* at p. 74, fn. 2.) It is therefore the date of the hearing, when the court was able to elicit from defendant his concerns, that we must treat as the date of defendant's *Faretta* motion.

---

[4] Defendant also argues that counsel's failure to advise the court of defendant's request to proceed in propria persona constituted ineffective assistance of counsel. This argument is addressed *post,* at page 83.

 Even if we were to accept defendant's March 5 contention, it would not change our conclusion that the court properly exercised its discretion in denying defendant's motion for self-representation as untimely. After two initial continuances, trial had been set to begin on March 5, but was again twice continued—first to March 9 and then to March 16, because both counsel were engaged in other trial proceedings on those days. Thus, had defendant made his *Faretta* motion on March 5, the day trial was set to begin, it would have been well within the court's discretion to deny the motion as untimely. (*Windham, supra,* 19 Cal.3d 121, 128.) Moreover, the fact that trial was continued on March 5 would not affect our decision because the trial court's discretion to deny the *Faretta* motion naturally would be based on the " 'facts as they appear at the time of the hearing on the motion rather than on what subsequently develops.' [Citation omitted]." (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669].)[5]

The dissent argues that the trial court erred in denying defendant's *Faretta* motion as untimely because "but for the fact that defendant Moore on March 5 and March 9 remained in a holding cell while his trial date was continued in his absence, Moore would have asserted his *Faretta* right *weeks before trial,* safely assuming, of course, a denial of his motion to 'go co-counsel.' " Accordingly, the dissent reasons, because "there is no showing suggesting or hinting defendant Moore's unequivocal request to exercise the constitutionally mandated unconditional right of self-representation was made for the *purpose* of delaying his scheduled trial or to obstruct the orderly administration of justice," the court should have granted defendant's *Faretta* request. The dissent relies principally on two federal cases for support. (*Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782; *Chapman* v. *United States* (5th Cir. 1977) 553 F.2d 886, 889.)

While it is true both *Fritz* and *Chapman* held that a court may not deny a *Faretta* motion simply because it is made on the day trial is to begin, the dissent fails to observe that both cases also reasoned a court may deny a *Faretta* motion if defendant's dilatory intent is found as long as the material facts surrounding the reason for defendant's late request are developed at the state-court hearing. (*Fritz, supra,* 682 F.2d 782, 784-785; *Chapman, supra,* 553 F.2d at p. 893.) *Fritz* specifically held that "In determining whether a defendant's request to defend himself is a tactic to secure delay, the court may, of course, consider the effect of delay. A showing that a continuance would be required and that the resulting delay would prejudice

---

[5] The fact defendant was in the holding tank when the case was continued by substitute counsel on March 5 and March 9 does not implicate, as defendant claims, an "independent Sixth Amendment violation," nor does it violate defendant's right to be present when arraigned or at all other subsequent stages of trial. (§ 977, subd. (b).)

the prosecution may be evidence of a defendant's dilatory intent. In this case, for example, where Fritz's pre-trial conduct had already caused substantial delay, a showing that his motion included a request for a continuance would be strong evidence of a purpose to delay." (*Fritz, supra,* 682 F.2d at p. 784.)

 As noted above, the trial court herein was well aware of defendant's stated reasons for delay in asserting his right to self-representation (*ante,* at p. 74, fn. 2), and properly concluded that granting defendant's *Faretta* motion and continuance request "would interfere with the orderly administration of justice to continue this case" and prejudice the prosecution. Thus, contrary to the dissent's assertions, we perceive no reason to disturb the sound reasoning of the trial court in denying defendant's *Faretta* motion.

Finally, although trial was eventually set to begin March 19, jury selection did not begin until March 26, in order to allow defense counsel to present pretrial motions pursuant to sections 995 and 1538.5. The fact that trial was postponed a week so that the court could hear the defense motions does not in any way affect our conclusion that the court properly denied defendant's *Faretta* motion as untimely, nor does it indicate the court mischaracterized the motion as having been made on the day trial was to begin. Only after it commenced trial proceedings did the court realize defense counsel planned to present the foregoing motions.

### III. GUILT PHASE CONTENTIONS

#### A. *Effective Assistance of Counsel at Trial*

 Defendant contends he was improperly denied his Sixth Amendment right to effective assistance of counsel at trial. His argument focuses on four specific instances in which he claims defense counsel failed to act in a reasonably competent manner and, he argues, the incompetency seriously prejudiced his case. Thus, defendant asserts that counsel's inadequate performance "constitute[d] the withdrawal of a potentially meritorious 'defense' within the meaning of *Pope.*" (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 423-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Defendant claims that counsel failed to (i) argue a proper legal ground for the suppression of evidence seized during defendant's arrest in Littleton; (ii) impeach prosecution witnesses Jones, Avery, and Collette; (iii) advise the trial court of an alleged request on March 5, 1984, by defendant to

proceed in propria persona; and (iv) challenge the method of jury selection as denying defendant a representative jury.

■ We have long held that a criminal defendant is constitutionally entitled to representation by a reasonably competent attorney acting as a diligent, competent advocate. (*Pope, supra,* 23 Cal.3d at p. 424.) ■ In making a claim that counsel was incompetent, however, defendant bears the burden of establishing ineffectiveness and must show counsel failed to conform to the above standard *and* that such failure resulted in the withdrawal of a potentially meritorious defense. (*Id.,* at p. 427; *Fosselman, supra,* 33 Cal.3d at p. 583; see also, *Strickland* v. *Washington* (1984) 466 U.S. 668, 691-696 [80 L.Ed.2d 674, 695-699, 104 S.Ct. 2052] [determining the standard of prejudice under the "reasonable probability test"].) ■ Further, once defendant has met his burden, the reviewing court must examine the record to determine if it contains any explanation for counsel's conduct. If such an explanation is apparent from the record and it is evident that "counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed." (*Pope, supra,* 23 Cal.3d at p. 425.) Finally, we will not ordinarily second-guess trial counsel's tactical decisions if we find those decisions are made on an informed basis. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 163 [158 Cal.Rptr. 281, 599 P.2d 587].) With the foregoing in mind, we now address each of defendant's ineffectiveness-of-counsel contentions.

1. *Representation at the Pretrial Motions*

■ Defendant argues counsel acted unreasonably because he failed to urge the proper legal ground for the suppression of evidence at the section 1538.5 hearing. Defendant claims that the arrest warrant was invalid, and the fruits of the search incident to arrest inadmissible, because the warrant was constitutionally deficient under the United States Supreme Court decision in *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317]. *Gates* held that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." (*Id.,* at p. 239 [76 L.Ed.2d at p. 549].) Here, the arrest warrant was based on information supplied by Avery, an admitted accomplice. Thus, the information was sufficient to support the issuance of the arrest warrant. (*Gates, supra,* 462 U.S. at p. 243 [76 L.Ed.2d at p. 551].) Counsel was not required to bring a motion on grounds which could not prevail and therefore his failure to argue lack of probable cause did not indicate ineffectiveness. (*People* v. *Frierson, supra,* 25 Cal.3d 142, 158.)

In any event, the People point out that before the section 1538.5 hearing, defense counsel filed a written motion "to suppress all evidence seized

during a search of the [Belleview Street] residence, with or without a search warrant, and all statements made by the defendant as a result of the unlawful search." Counsel advanced several grounds in favor of the motion (e.g., warrant executed at night, *no probable cause* to arrest defendant and improper delivery of evidence to Long Beach authorities), and cross-examined three of the four witnesses who appeared at the hearing. Moreover, counsel successfully objected to the introduction of several exhibits offered by the prosecution. Thus, the record shows that although defense counsel was unsuccessful in convincing the court to suppress the evidence linking defendant to the Crumb murders, counsel competently defended his client at the section 1538.5 hearing.

### 2. *Concealment of Self-representation Request*

 Defendant next contends counsel purposefully frustrated his desire to proceed in propria persona by failing promptly to inform the court that defendant wanted to represent himself. Defendant argues that counsel's delay resulted in the denial of defendant's *Faretta* motion as untimely. We reject this argument because it fails to show any malfeasance by counsel, nor does it indicate counsel behaved in a manner less than diligent and conscientious. (*Pope, supra,* 23 Cal.3d 412.) Indeed, defendant's March 12 letter is unclear whether he actually told his counsel he wanted to represent himself. Counsel is certainly entitled to state his opinion to his client about the success of a contemplated motion. We refuse to "second-guess" counsel's response in the context of defendant's March 12 letter because we believe defendant's contention does not indicate that counsel's response was unreasonable in any regard. (*Fosselman, supra,* 33 Cal.3d at p. 584; *Pope, supra,* 23 Cal.3d at pp. 423-425.)

### 3. *Impeachment of Prosecution Witnesses*

 Defendant next argues counsel unreasonably failed to impeach three prosecution witnesses, Jones, Avery and Collette. As we explain below, after reviewing the record, we are satisifed that defense counsel's failure to impeach these witnesses involved sound tactical decisions. (*Frierson, supra,* 25 Cal.3d at p. 158.) We therefore conclude that counsel acted as a conscientious and diligent advocate at all times during the trial. (*Ibid.*; *Fosselman, supra,* 33 Cal.3d at pp. 583-584; *Pope, supra,* 23 Cal.3d 412, 423-425.)

Jones testified that he was intoxicated on the night of the Crumb murders and that he did not remember seeing defendant in front of the Long Beach apartment complex where the Crumbs resided. Defendant now claims that counsel should have impeached Jones with testimony he gave at the trial of

Lee Edward Harris (which preceded defendant's trial), in which Jones stated he was sober on the night in question. Defendant fails to point out, however, that at the Harris trial, Jones also testified that he did not remember seeing defendant at the complex entrance.

Because the critical portion of Jones's testimony supported defendant's alibi (that he was not at the Crumbs' apartment when they were murdered), we do not agree that counsel's failure to impeach Jones resulted in the withdrawal of a potentially meritorious defense (*Pope, supra,* 23 Cal.3d at p. 425), or that a determination more favorable to defendant would have resulted had Jones been impeached. (*Fosselman, supra,* 33 Cal.3d at p. 584.) Indeed, because Jones's testimony was *favorable* to defendant, it appears counsel's decision to avoid impeaching Jones with a prior inconsistent statement was a reasonable tactical choice. (*Frierson, supra,* 25 Cal.3d at p. 158.)[6]

Similarly, our review of the record reveals that counsel's decision not to impeach Avery was also well within the range of competency contemplated by our decisions in *Pope, supra,* 23 Cal.3d at pages 423-425, and *Fosselman, supra,* 33 Cal.3d at page 584. Defendant complains that counsel failed to impeach Avery in regard to the following three inconsistencies in her testimony: (i) Avery testified at trial she saw defendant stab Crumb in the back, whereas the autopsy revealed he was stabbed in the chest, abdomen, and back of the scalp; (ii) Avery testified at the preliminary hearing that three knives were used in the Crumb murders, whereas at trial she testified that only two knives were used;[7] and (iii) she falsely testified at trial she "turned herself in" when it was actually her mother who phoned the police and told them Avery was staying with her and had been an accomplice to murder.

The record reveals that counsel had reviewed the transcript of the Harris trial and chose to refrain from impeaching Avery on the above points because he did not want to distract the jury by pointing out relatively minor inconsistencies in Avery's recollection of the details surrounding the execution of the crime. Instead, counsel believed it would be best to "restrict [his]

---

[6] Defendant requests we take judicial notice of the portions of Harris's trial record that refer to the testimony of Jones (and Collette). We decline to do so because the *Harris* record is unnecessary to our discussion of the effectiveness claim. (Evid. Code, § 452, subd. (d).)

[7] Defendant makes a similar argument regarding the testimony of Collette, the investigating officer, who stated at the preliminary hearing that three knives were used in the Crumb murders, but testified at trial that two knives were *found* at the murder scene. The People point out that the record of Harris's trial indicates Collette testified there were only two knives seized at the crime scene. We do not find counsel's failure to cross-examine Collette on this issue indicative of incompetent representation because the testimony is not inconsistent: three knives could have been used, but only two were found. Defendant does not indicate how the possibility that only two knives were found would further his defense.

argument to whether or not defendant was [at the Crumb apartment on the night of the murders] in the first place." In this regard, the record shows counsel cross-examined Avery on the following points: (i) her prior inconsistent statement that she stabbed Mrs. Crumb twice which conflicted with her trial testimony that she stabbed Mrs. Crumb once; and (ii) evidence that Avery admitted lying to the police when she first admitted she had knowledge of the Crumb murders by telling the police she never entered the Crumb apartment.

Finally, the record shows that before the defense closing argument, defendant asked to speak with the trial judge to discuss his dissatisfaction with counsel and to request that he jointly argue the case to the jury or represent himself in the final argument. An in camera discussion between defendant, the court and defense counsel followed and counsel explained, to the court's satisfaction, his tactical decision not to impeach Avery or Collette on their recollection of specific details of the crime or its investigation.[8] In denying (without prejudice) defendant's request to act as cocounsel, or in the alternative to represent himself during final argument, the court opined that defendant was "well represented by counsel" and that counsel's tactical decisions appeared well reasoned.

We agree with the trial court's determination that counsel adequately represented defendant at trial. He cross-examined Avery on key inconsistencies in her pretrial statements and his closing argument stressed the inconsistencies in her overall testimony, including her lapse in memory regarding the specific details of the crime. We cannot therefore find counsel was unreasonable in his tactical choices.

### 4. Failure to Challenge Jury Selection Method

Finally, defendant argues that counsel was unreasonable in failing to challenge the method of selecting a jury venire from voter registration lists. Defendant does not argue that he was deprived of a representative jury on this point, but simply asserts that counsel's failure to move to quash the jury venire is another indication of inadequate performance. He relies on our decision in *People* v. *Harris* (1984) 36 Cal.3d 36, 45-59 [201 Cal.Rptr. 782, 679 P.2d 433], in which we decided that the defendant had made "a

---

[8] Counsel informed the court: "There are some inconsistencies Mr. Moore just mentioned that I do not intend to argue. . . . I do not intend to argue that [Avery] is lying about somebody taking rings off somebody else. I do not intend to argue that somebody stabbed a victim in the chest when she thought it was the back or vice versa. I don't intend to argue those things. [¶] I intend to restrict my argument to whether or not the defendant was there in the first place and I intend to bring out the inconsistencies in [Avery's] testimony to show that she's lying about that, not about some of the details that went down. That's my method of doing things."

prima facie showing of a violation of his right to a jury drawn from a representative cross-section of the community" (*id.*, at p. 59) and that such a violation [was] prejudicial per se. (*Ibid.*) Defendant stresses that Harris was *tried in the same courthouse* (three years earlier) as was defendant, and asserts counsel had an obligation to consult the record of the Harris trial in preparation for trial of defendant's case. He claims that *the failure to challenge the jury selection process* demonstrates that his "trial representation was constitutionally defective."

We cannot agree. There is no indication in the record that defendant was either deprived of a representative jury or that counsel's failure to challenge the jury venire was unreasonable within the meaning of either *Pope, supra,* 23 Cal.3d at pages 423-425, or *Fosselman, supra,* 33 Cal.3d at pages 583-584. Accordingly, defendant's claim is without merit.

### B. *Denial of a Representative Jury*

■ Defendant asks us to reconsider our decision in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-352 [197 Cal.Rptr. 803, 673 P.2d 680], in which we held that exclusion for cause of persons automatically opposed to the death penalty from the guilt phase of the trial does not deprive defendant of his right to a jury drawn from a representative cross-section. He notes that two prospective jurors were removed for cause under the principles of *Witherspoon* v. *Illinois* (1967) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], because they stated that under no circumstances could they vote for the death penalty.[9] Defendant argues that exclusion of these prospective jurors violated the fair cross-section requirement of the Sixth Amendment to the federal Constitution. We see no reason to reconsider our decision in *Fields, supra,* 35 Cal.3d 329, and note in particular that the United States Supreme Court has similarly found that exclusion of prospective jurors under *Witherspoon* does not deprive a defendant of a representative jury. (*Lockhart* v. *McGree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; see *People* v. *Miranda* (1987) 44 Cal.3d 57, 79 [241 Cal.Rptr. 594, 744 P.2d 1127].)

### C. *Accomplice Instructions*

■ The court instructed the jury regarding accomplice testimony and the need for corroboration because Avery was an accomplice as a matter of

---

[9]Defendant actually argues that four prospective jurors were removed for cause because they stated they would automatically vote against the death penalty. His characterization of the record is in error. Our review of the record reveals that although two potential jurors were excused for cause on *Witherspoon* grounds, the other two prospective jurors were excused on *defense* counsel's challenge for cause because they stated they would, under any circumstances, vote *for* the death penalty if defendant were found guilty of the Crumb murders.

law in the Crumb murders.[10] Specifically, the court gave CALJIC No. 3.11, which is a restatement of section 1111 and requires corroboration of accomplice testimony. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 829 [218 Cal.Rptr. 49, 705 P.2d 372].) Defendant claims that the foregoing instruction was undermined, and the jury confused, because the court further instructed under the language of CALJIC No. 2.27. That instruction provides: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

Defendant points out that the use note to CALJIC No. 2.27 (which was derived from our decision in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]) provides that the court should not "give [the] instruction if corroboration is required, such as in Penal Code [section] 1111 (testimony of accomplice)." Accordingly, defendant argues that the combination of the two instructions (Nos. 2.27 and 3.11) amounted to prejudicial error in that the jury "could literally flip a coin to decide which standard to apply" and potentially erroneously convict him on Avery's testimony alone without considering corroborating evidence.

We do not believe a reasonable juror would have been so misled. In addressing the merits of defendant's argument, "we must look to the entire charge, rather than merely one part, to determine whether error occurred." (*Chavez, supra,* 39 Cal.3d 823, 830; *People* v. *Stewart* (1983) 145 Cal.App.3d 967, 975 [193 Cal.Rptr. 799]; *People* v. *Hunter* (1956) 146 Cal.App.2d 64, 67 [303 P.2d 356].) In so doing, we note that the instructions, viewed as a whole, were actually beneficial to defendant, the only defense witness to testify at the trial.

Not only were CALJIC Nos. 2.27, 3.11 and 3.16 given, but the jury was also instructed that the evidence of corroboration must itself connect defendant with the commission of the crime (No. 3.12), and that the panel must view testimony of the accomplice with distrust (No. 3.18). The emphasis placed on the need for corroboration and the caution with which the jury should consider accomplice testimony amply demonstrates that the jury was adequately instructed on how to evaluate Avery's testimony.

In addition, both the prosecution and the defense emphasized that Avery's testimony required corroboration in order for it to be considered by

---

[10] The jury was instructed under CALJIC No. 3.16 that: "If the crimes of murder, burglary and robbery were committed by anyone, the witness Terry Elaine Avery was an accomplice as a matter of law and her testimony is subject to the rule requiring corroboration."

the jury. In his closing argument, the prosecutor stated that because Avery was an accomplice as a matter of law, her testimony required corroboration. He then highlighted the corroborating testimony for the jury: the cross-examination testimony of the defendant that it was his idea to rob the Crumbs;[11] the Kona Hotel receipts; the murder weapons; and the fact that defendant was in possession of the most valuable items of jewelry owned by the Crumbs.

Similarly, the defense argued, "You have to view all the evidence of the case as though she didn't take the stand and testify, and then you have to find some evidence that tends to connect—that does connect [defendant] with the crime. Once you do that—you can apply all the normal rules of evaluating evidence, but then once you do that if you find that there isn't any then you have to reject her testimony and not consider it at all. [¶] If you do find corroboration then, of course you consider her testimony. If you consider her testimony there is one other thing you must be aware of. The court is going to tell you in effect that you can't trust Terry Avery. The words are going to be—[the court] is going to tell you you ought to view her testimony with distrust. That's the law. That's what the court is going to tell you and that is distrust all her testimony."

Finally, we believe that on this record, a reasonable juror would have understood its duty to consider Avery's testimony only after it found support in corroborating evidence. In *Chavez, supra,* 39 Cal.3d 823, 830, the jury found the defendant guilty of murder with the special circumstance of robbery. The conviction was based in large part on the testimony of a codefendant. The court instructed the jury under CALJIC Nos. 2.27 and 3.11 and defendant argued that the "net effect of Nos. 2.27 and 3.11 was to permit the jury to convict based solely on the testimony of [the codefendant]." (*Ibid.*)

We affirmed, holding that the effect of the combined instructions was not error. In so holding, we stated that "[b]oth the prosecution and the defense proceeded on the premise that corroboration was needed. The prosecutor never argued to the jury that it could accept [the codefendant's] testimony without corroboration. Rather, he took care during his closing argument to

---

[11] The prosecutor stated: "Terry Elaine Avery was in this courtroom and as a matter of law an accomplice to these crimes. No effort has been made to shield that fact, hide it or otherwise avoid the impact of it. What does that mean? It means that [Avery] would be in the abstract liable for the same charges as Mr. Moore because she participated in them with knowledge of what was going on. [¶] Because of that reality that she would be liable for these crimes other than being granted immunity, you must consider her testimony with one special provision. That is, you cannot convict Mr. Moore based solely upon her testimony unless and until her testimony is independently corroborated by other evidence which proves in any particular . . . that she's telling the truth."

point out [corroborating statements of other witnesses]. As a result, the jury was not misled as to the need for corroboration and no prejudice resulted. The emphasis placed on the corroboration requirement, and on the other accomplice instructions, demonstrates that the jury was properly instructed on the proper standard of evaluating [codefendant's] testimony." (*Chavez, supra,* 39 Cal.3d at p. 831; see also, *Stewart, supra,* 145 Cal.App.3d at p. 975.) Based on our review of the record and the foregoing analysis, we also conclude that the instructions, as given, did not mislead the jury.

### D. *Right to Speedy Trial*

██ Defendant asserts he was misadvised of his statutory rights under section 1382, subdivision (b),[12] and was denied his right to a speedy trial because trial counsel failed to advise him of his right to be tried within 10 days following the 60-day period after arraignment. Although defendant concedes he was not prejudiced by any error that may have occurred, he asserts the contention to demonstrate "trial counsel's attitude toward this case." Defendant relies on *Owens* v. *Superior Court* (1980) 28 Cal.3d 238 [168 Cal.Rptr. 466, 617 P.2d 1098], to further bolster his argument.

As stated earlier, our review of the record indicates that counsel was diligent in preparing defendant's case for trial. The record shows that defendant consented to all continuances and advised the court that he understood his rights relating to the statutory speedy trial provision. Because defendant was on trial for other crimes (including the Norwood murder) in Kansas and Colorado, the information pertaining to the Crumb murders was not filed until July 22, 1983. Accordingly, under section 1382, subdivision (b), the 60-day grace period expired on September 20, 1983. Defendant, however, waived time on July 22, and requested a trial date of November 15 of that year. The case was continued three more times, with defendant's consent (express or implied) and time waiver, to March 16, 1984. Jury selection began on March 26, 1984, within the 10-day time period of the statute. (§ 1382, subd. (b).)

Furthermore, *Owens, supra,* 28 Cal.3d 238 is inapposite. There, the court continued the defendant's robbery trial over his specific objection and eventually denied his motion to dismiss after it found good cause to continue the case. (*Id.,* at p. 243.) We reversed, holding "there was no trial within either the 60-day or 10-day periods provided by section 1382." (*Id.,* at p. 250.) We

---

[12]Section 1382 provides, in pertinent part, that the court must dismiss an action: "(b) When a defendant is not brought to trial in a superior court within 60 days after the finding of the indictment or filing of the information . . . ; except that an action shall not be dismissed under this subdivision if it is set for trial on a date beyond the 60-day period at the request of the defendant or with the defendant's consent, express or implied. . . ."

also found that "the prosecution's meager attempts to locate its witnesses within the statutory period did not establish good cause to delay the trial and avoid dismissal." (*Id.*, at p. 253.)

Based on the foregoing, we find that defendant was not prejudiced by any perceived delay under section 1382. (*People v. Johnson* (1980) 26 Cal.3d 557, 574-575 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

## IV. SPECIAL CIRCUMSTANCES CONTENTIONS

### A. *Overlapping Burglary-murder and Robbery-murder Special Circumstances*

■ Defendant relies on *People* v. *Harris, supra,* 36 Cal.3d 36, 65-66, to assert the jury erroneously found, at the guilt/special circumstances trial, two special circumstances (burglary-murder and robbery-murder) as to each victim, which arose from a single, indivisible course of criminal conduct with a single intent. We have recently considered and rejected this contention in *People* v. *Melton* (1988) 44 Cal.3d 713, 765-769 [244 Cal.Rptr. 867, 750 P.2d 741], and find no grounds to reconsider the issue here.

### B. *Multiple-murder Special-circumstance Findings*

■ Defendant correctly contends the prosecution erred in charging two separate multiple-murder special circumstances on the basis of the two homicides. As we held in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115], only one such special circumstance should have been charged relating to both individual murder counts. Accordingly, one multiple-murder special-circumstance finding must be vacated.

## V. PENALTY PHASE ISSUES

### A. *Inadequate "Sympathy" and Mitigating Instructions*

■ At the conclusion of the guilt phase, the jury was instructed pursuant to CALJIC No. 1.00, that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." At the penalty phase, the jury was instructed under former CALJIC No. 8.84.1 that it could consider as a sentencing factor "any other circumstance which extenuates the gravity of the crime." (Former § 190.3, factor (j).) Defendant argues that because the guilt phase instruction was given to the jury only five days before the penalty phase began, the jury was misled

regarding the mitigating factors it could consider in determining whether death was the appropriate sentence.

We recently rejected a similar argument in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301], in which we found "no prejudicial carryover effect from the guilt phase no-sympathy instruction." (*Id.*, at p. 1209.) We reached the same conclusion in *People* v. *Ghent* (1987) 43 Cal.3d 739, 777 [239 Cal.Rptr. 82, 739 P.2d 1250].

In *Ghent,* however, we also recognized that the United States Supreme Court, upon reviewing our decision in *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837, 842], "stressed the necessity of analyzing the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case." (*Ghent, supra,* 43 Cal.3d at p. 777.) After undertaking such a review of the record, we conclude the jury would not have been misled regarding the scope of its sentencing discretion.

The record discloses the prosecutor specifically informed the jury that it was to consider sympathy as well as defendant's background and character evidence in reaching its sentencing determination. The prosecutor told the jury that "in considering the possibility of the correctness of mercy versus judgment or death, you must take into account the humanity of the individual himself and the nature of his conduct and his life as it has meaning to you . . . . [¶] Consider that he has now professed the finding of his savior; consider and ask yourselves whether that is too little and by far too late. [¶] Consider he had a bad childhood and apparently his father did not treat him well or kindly at all and taught him to steal. Consider that. [¶] Consider he came from poverty and extreme poverty. . . ." Similarly, defense counsel specifically told the jury to conside "compassion, sympathy, passion, [and] mercy."

After viewing the record as a whole, we are satisfied that a reasonable juror would have understood that it was to consider defendant's childhood and background as well as feelings of mercy engendered by such testimony in determining penalty. We therefore find no error.

B. *Argument in Violation of Davenport*

■■■ During closing argument, the prosecutor told the jury that the *absence* of various statutory factors relevant to mitigation should be consid-

ered aggravating factors in the jury's sentencing deliberations.[13] As we held in the plurality opinion of *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861], this argument was improper.

Although the prosecutor's argument is contrary to *Davenport,* we consider it harmless. First, a timely admonition could have cured the prosecutor's mischaracterization of the statutory factors. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) Second, the jury was instructed to consider only "applicable" aggravating and mitigating factors. (*Ghent, supra,* 43 Cal.3d at p. 775.)

Third, in the beginning of his closing argument, the prosecutor specifically told the jury that only *applicable* factors should be considered in its deliberations. The prosecutor then stated: "Now, whether they are aggravating, mitigating, or in the no-man's land that we will call neutral, and we will get to that in a minute, is for you to decide individually and collectively in your judgment function." (See also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790 [230 Cal.Rptr. 667, 726 P.2d 113].) Therefore, because the jury was well aware of the underlying facts, and in light of the prosecutor's opening statement and overwhelming nature of the properly admitted aggravating evidence, it is highly unlikely that the mischaracterization of the aggravating circumstances in this case substantially influenced the jury's decision.

In addition, defense counsel's argument stressed the fact that the court's instructions allowed the jury "a tremendous amount of leeway" in determining the aggravating or mitigating nature of the relevant factors. Counsel stated: "[I]s each factor a mitigating factor or aggravating factor? You have heard it once but you are going to hear it again. . . . [E]ach one of you on your own has to decide each one of those factors, whether it is a mitigating or aggravating factor . . . any one mitigating factor by itself, is sufficient to

---

[13] As to former section 190.3, factor (c) (extreme mental or emotional disturbance), the prosecutor told the jury: "[I]f you find it was not true that there was any mental or emotional disturbance, it must be, I think, logically a factor in aggravation." As to factor (d) (victim consented to homicidal act), the prosecutor argued, "How do you weigh it if they were totally victims? I suggest it must be a factor in aggravation or it has no meaning." As to factor (e) (moral justification), he told the jury, "[I] can see no belief in moral justification of this crime or these crimes. Therefore, you must find that there was no moral justification believed, whether in fact true, and it is a factor in aggravation." As to factor (f) (extreme duress or substantial domination of another person), he stated: "If you find that the defendant was not acting under duress and was not under the substantial domination of another, you must then decide whether that's a factor of aggravation or mitigation." Next, when discussing factor (i) (defendant a minor accomplice), he told the jury, "if . . . you find he is the main mover, these crimes are his brainchild, and he was the primary person conducting himself in the violent ways that lead to his conviction, you should find that a factor in aggravation."

spare this man's life. You need no other. You only need one." In light of the above considerations, we are confident that the prosecutor's unobjected-to mischaracterization of the aggravating factors was not prejudicial to defendant and that the jury's sentencing decision is constitutionally reliable. (*Ghent, supra,* 43 Cal.3d at pp. 775-776.)

### C. *Excessive Multiple-murder Special-circumstance Findings*

■ As noted above, the prosecution erred in charging two separate multiple-murder special circumstances instead of one, on the basis of the two murders. We cannot, however, deem the error prejudicial. When we considered a similar claim in *People v. Rodriguez, supra,* 42 Cal.3d 730, we held the error harmless because the "jury knew the actual number of murders of which [defendant] had been convicted, and it was permitted to consider the fact of multiple murder as an aggravating circumstance." (*Id.,* at p. 788, see also *Allen, supra,* 42 Cal.3d at p. 1273.) Similarly, in the present case, we cannot imagine that the jury thought both Crumb murders were "more heinous because two multiple-murder special circumstances had been charged." (*Rodriguez, supra,* 42 Cal.3d at p. 788, italics omitted.)

### D. *Proportionality Review*

Defendant makes familiar arguments regarding the constitutionality of the 1977 law that have been considered and rejected by us in recent opinions. (See, e.g., *Ghent, supra,* 43 Cal.3d at p. 778; *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) ■ He also contends his sentence was constitutionally disproportionate under *People v. Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697], and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. Defendant specifically argues that because his accomplice, Harris, received a sentence of life without possibility of parole on retrial, and because he and Harris were defendants in the "same case," his sentence was arbitrary and disproportionate under the Eighth Amendment.

We disagree. Defendant and Harris were tried separately. Defendant admitted at trial that he alone had planned the Crumb robbery. Moreover, the aggravating circumstances showed defendant was convicted of the Norwood murder in Kansas. In light of these facts, defendant cannot assert that the punishment imposed was disproportionate to his individual culpability. (*Allen, supra,* 42 Cal.3d 1222, 1285-1286; *Miranda, supra,* 44 Cal.3d at p. 118.)

### VI. HABEAS CORPUS

■ Defendant in propria persona previously has filed separate petitions for a writ of habeas corpus. He contends he was denied the right to a

speedy trial under section 1382, and that his various pretrial motions were erroneously denied. (Crim. Nos. 24849, 25087 & 25921.) We consolidated No. 24849 with the appeal. Number 25087 raises the identical arguments as does No. 24849. On December 11, 1986, we denied No. 25921 because it did not raise any issue that we were not considering in the appeal. After reviewing each of defendant's claims, we find he fails to make a prima facie case for relief. Accordingly, we deny the petitions for a writ of habeas corpus in Crim. Nos. 24849 and 25087.

## VII. CONCLUSION

Because we find that no prejudicial error occurred at either the guilt or penalty phase of defendant's trial, the judgment of guilt, finding of five special circumstances, and the judgment of death are affirmed.

Mosk, J., Panelli, J., Kaufman, J., and Low (Harry W.), J.,* concurred.

**BROUSSARD, J.**—I concur in the majority opinion in affirming the judgment of guilt and five[1] special circumstance findings and in affirming the penalty judgment. I write separately to register my objection to this court's practice of requiring defense counsel to foresee the future.

In 1985, we established that at the penalty phase of a capital trial, the absence of evidence of a mitigating factor does not transform it into an aggravating factor. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].) We later noted that in cases tried before *Davenport* was decided, "we do not describe the prosecutor's mistaken argument as misconduct. For the same reason, we could not treat a defense counsel's failure to object as incompetence or waiver." (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342].)

Nonetheless, the majority has begun to reject claims under *Davenport* in part because "a timely admonition could have cured the prosecutor's mischaracterization of the statutory factors. (*People* v. *Green* (1980) 27 Cal.3d

---

*Presiding Justice, First Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

[1] There were six special circumstance findings: two robbery-murder special circumstances, two burglary-murder special circumstances, and two multiple-murder special circumstances. (The majority vacate one of the duplicative multiple-murder special circumstances under the authority of *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) I concur, but as to the special circumstances of felony murder based on robbery and burglary, would have required a jury instruction that if an indivisible course of conduct were involved, these could not each be considered as a distinct aggravating factor. (See *People* v. *Harris* (1984) 36 Cal.3d 36, 65-66 [201 Cal.Rptr. 782, 679 P.2d 433].) The majority reject this view. Though I disagree, I see no reversible error.

1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)" (See, *ante,* p. 92.)[2] The citation to *People* v. *Green* indicates that the majority consider the claim as involving prosecutorial misconduct. We said in *Green* that trial counsel must object to prosecutorial misconduct in order to preserve the issue for appeal, unless a timely admonition would not have cured the harm.

Defense counsel cannot be expected to object to a prosecutor's argument on the basis of *Davenport* before that case was decided. Before *Davenport* was decided, no admonition to the jury would have been forthcoming even if counsel had objected. It is self-evident that the majority's reference to the waiver rule of *People* v. *Green* is totally misplaced. Yet in this case, and in others, the majority evidently have confidence that defense counsel can foresee our opinions. This is asking too much.

The majority also reject defendant's argument that there was *Davenport* error on the ground that the court instructed the jury to consider only "applicable" aggravating and mitigating factors. I disagree. Such an instruction does nothing to rectify the confusion caused by a prosecutor's argument that the jury should consider the absence of evidence in mitigation as evidence in aggravation. "The vice of *Davenport* error is that it tells the jury that factors are applicable when as a matter of law they are not and that factors are aggravating when as a matter of law they are neutral or mitigating. Nothing in the judge's instructions would dispel such erroneous impressions." (*People* v. *Bonin, supra,* 46 Cal.3d at p. 710 (conc. opn. by Broussard, J.)

Nonetheless, I agree with the majority that the *Davenport* error in this case was not prejudicial. The prosecutor candidly told the jury that it was up to them to decide whether evidence should be considered as aggravating, mitigating, or neutral under the statutory scheme. The prosecutor's argument was temperate and accurate except for the *Davenport* error. The prosecutor thus gave a fair presentation of the law, and did not place much reliance on the argument that lack of evidence of a circumstance in mitigation should be used in aggravation. I conclude that it is not reasonably possible that, in the absence of the error, the jury would have returned a different verdict.

**WHITE (Clinton W.), J.,** * Dissenting.—I would reverse the judgments. My assessment of the record reveals clear *Faretta* (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]) error.

---

[2] See, e.g., *People* v. *Bonin* (1988) 46 Cal.3d 659, 701-702 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *McDowell* (1988) 46 Cal.3d 551, 573 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].

* Presiding Justice, First Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.

Beyond question, under any assessment of the record, the time arrived during defendant Moore's jail confinement awaiting trial that he justifiably concluded he was in need of an audience with the Master Calendar Judge. Moore's letter to the court, dated March 10, 1984, establishes this fact. (See maj. opn., p. 74, fn. 2.) It bears noting that Moore ended his letter thus: "FARETT V. CALIF, 422 US.," suggesting the notion that Moore may have understood that Faretta made his pro se motion "weeks before trial" (*Faretta* v. *California, supra,* at p. 835 [45 L.Ed.2d at p. 582]) and consequently justifiably believed that his motion, also made before trial, would not be too late, i.e., that he had not lost or forfeited his right nor would it be deemed waived.[1] In any event, it is understandable that on Friday, March 16, 1984, defendant Moore's letter generated considerable verbal exchange between the calendar judge and defendant Moore. Apparently court appointed defense counsel's interests conflicted with Moore's personal choice. Defense counsel did not support Moore's several pretrial motions including his ultimate request to be permitted to exercise his personal choice to go to jail or suffer death, if need be, under his own banner. (*United States* ex rel. *Maldonado* v. *Denno* (2d Cir. 1965) 348 F.2d 12, 15.) Further, the calendar setting judge's view did not give much, if any, promise to Moore's personal choice: "It's up to me to. I have a responsibility under the law to make sure you don't go out and commit suicide, legal suicide, by trying to represent yourself. It's not for him [defense counsel] to say whether you go pro per or not."

No criticism of the court is intended and none should be inferred. Obviously the calendar court, in accord with *Faretta,* was simply speaking in the context of pointing out the disadvantages of self-representation. Of course, when Moore, as he did, became even more adamant and unequivocal the court's duty required it to stop and reverse direction protecting Moore's fundamental pro se right, not an easy maneuver. Cost efficiency being a premium, master calendar courts exist to move cases in the orderly administration of justice avoiding untoward delay. Moreover, while the fundamen-

---

[1] It bears noting that in *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], the court, at page 129, briefly engaged in *waiver* analysis, holding in effect that Windham's failure to make a pretrial *Faretta* request amounted to a waiver of the unconditional right of self-representation. Given, then, defendant Moore's pretrial *Faretta* request made in close proximity to the date of his trial, it cannot be found that Moore waived or forfeited his constitutional right to be his own lawyer at trial if reasonable cause justifying the lateness of his request appears of record. (*Windham, supra,* fn. 5, at p. 128.) As I see this case, then, if the Master Calendar Court had but thought to indulge *waiver* analysis, the court undoubtedly would have extended its protecting duty to Moore's *request,* afforded by *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357] at pages 464-465 [82 L.Ed. 1461 at pages 1466-1467]. Moore's Sixth Amendment rights of self-representation and to the assistance of counsel are sides of the same coin, both cherished fundamental rights. Having focused in on waiver during its decisionmaking, the calendar court would have recalled that this court would not presume waiver of a fundamental right from a silent record.

tal *Faretta* right is a cherished right, the motion in truth is not in favor in our courts. Understandably, the predisposition of our state's courts, shared unanimously, I presume, without dissent by this court, is that the criminal defendant's due process right to a fair trial and the state's correlative interest in truth finding are both better served in an assisted by counsel trial. Particularly is this our predisposition in criminal cases implicating the death penalty. But, of course, the *Faretta* court appreciated that the help of a lawyer is essential to assure a criminal defendant a fair trial. As we know, however, the high court's majority held nonetheless that a state may not constitutionally compel a criminal defendant truly choosing to proceed pro se to accept assistance of counsel. (See *Faretta* v. *California, supra,* 422 U.S. at pp. 832-834 [45 L.Ed.2d at pp. 579-581].

Earlier, during Friday's colloquy, Moore is reported in the Reporter's Transcript as follows: "THE DEFENDANT: Okay. Under the federal law I have a right to represent myself; is that correct? "THE COURT: You have a right to represent yourself if you are—if you make a knowing and intelligent waiver of your counsel; that's true. "THE DEFENDANT: Okay. And I was informed, too, that . . . ."

On this record, we do not know when the defendant was first informed of his constitutional pro se right, for certain Moore was not so informed at his arraignment. On March 16, 1984, however, the intent of his letter undergoing the court's inquiring scrutiny, defendant Moore made a showing revealing to the Master Calendar Court the circumstances giving rise to his decision to invoke pretrial his constitutional right to act as his own lawyer. Moore's letter, reproduced in footnote 2 in the majority opinion, page 74, vividly portrayed to the court those circumstances, including the fact that it was Moore's assigned counsel who sowed in Moore's mind the seed of going pro se. Moreover, those circumstances were never challenged or disputed by defense counsel during the *Faretta* hearing. Unquestionably, then, a showing was made before the calendar judge that but for the fact that defendant Moore on March 5 and on March 9 remained in a holding cell while his trial date was continued in his absence, Moore would have asserted his *Faretta* right *weeks before trial,* safely assuming, of course, a denial of his motion to "go cocounsel." Consequently, for reasons that follow, I disagree with the majority's belief that the Master Calendar Court was correct in denying Moore's *Faretta* motion as being made untimely.

"*Faretta* held that a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so, and that the state may not force a lawyer upon a defendant who properly asserts that right." (*Chapman* v. *United States* (5th Cir. 1977) 553 F.2d 886, 889.) Chapman, a federal criminal defendant, on the day of his

trial, but at the earliest opportunity to directly address the court, twice requested unequivocally before empanelment of the jury his right to proceed pro se. The district trial court denied Chapman's requests and he proceeded to trial with the assistance of counsel against his will. Following an unsuccessful appeal of the judgment entered upon the jury's guilty verdict, Chapman's motion to vacate judgment was denied by the lower court. On appeal, the *Chapman* court reversed and remanded, holding: "In sum, Chapman should not have been denied his constitutional right to represent himself on the ground that his assertion was untimely. He asserted the right before the jury had been empaneled, and there is no suggestion that he sought to delay or disrupt the trial." (*Chapman, supra,* at p. 895.)

The *constitutional* right of self-representation accorded finality in *Faretta,* must, of course, be timely asserted. (*United States* v. *Kizer* (9th Cir. 1978) 569 F.2d 504, 507, cert. den. 435 U S. 976 [56 L.Ed.2d 71, 95 S.Ct. 1626].) However, we know that the erroneous denial of a timely asserted pretrial *Faretta* motion is reversible per se; the defendant need not show prejudice. "The nature of the right to defend pro se renders the traditional harmless error doctrine peculiarly inapposite." (*Chapman* v. *United States, supra,* 553 F.2d at p. 891; see also *People* v. *Ruiz* (1983) 142 Cal.App.3d 780, 788 [191 Cal.Rptr. 249].)

"Under the federal law," quoting defendant Moore, the federal Ninth Circuit determines timeliness of constitutional or pretrial *Faretta* motions by the identical standard employed by the *Chapman* court in the Fifth Circuit. In the case *Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782, Fritz was a State of Washington criminal defendant who invoked his *Faretta* right on the morning of his trial scheduled to start in the afternoon. The trial court denied Fritz the exercise of his *Faretta* right on the grounds that he was not competent to act as his own counsel. On appeal, the court of appeals held Fritz competent, but affirmed the trial court's denial of the *Faretta* motion on the ground that the motion was a tactic on Fritz's part to delay his scheduled trial and obstruct the orderly process of justice. The State of Washington Supreme Court denied review. Fritz's statutory petition for writ of habeas corpus in the federal district court sought an evidentiary hearing which the federal magistrate denied as unnecessary. The federal magistrate ruled Fritz's motion the morning before trial untimely because it would have resulted in a delay of trial. Adopting the magistrate's report, the federal district court's order denied writ relief. On appeal, the *Fritz* court vacated the district court's order holding: "Fritz asserted his *Faretta* right on the morning of an afternoon trial, before any trial proceedings had begun. It was therefore timely as a matter of law, unless it was made for the purpose of delay." (*Fritz, supra,* at p. 784.) The *Fritz* court then remanded, holding: "We hold only that the facts material to Fritz's constitutional

claim were not adequately developed in state court and that Fritz is thus entitled to an evidentiary hearing in federal district court to determine whether his motion to proceed pro se was made as a tactic to delay the start of trial." (*Fritz, supra,* at p. 786.)

Based on the record under review, there is no showing suggesting or hinting defendant Moore's unequivocal request to exercise the constitutionally mandated unconditional right of self-representation was made for the *purpose* of delaying his scheduled trial or to obstruct the orderly administration of justice. Indeed, I do not read the court's majority opinion as contending or holding to the contrary. Likewise, the record amply demonstrates that Moore, after being thoroughly made aware by the calendar judge of the disadvantages of proceeding pro se, voluntarily and intelligently elected to do so, with his eyes wide open, so to speak.

Obviously, *Fritz* and *Chapman* demonstrate that the federal timeliness standard implements the exercise of the *Faretta* right, not limits it. "Delay per se is not a sufficient ground for denying a defendant's constitutional right of self-representation. Any motion to proceed pro se that is made on the morning of trial is likely to cause delay; a defendant may nonetheless have bona fide reasons for not asserting his right until that time, see *Chapman,* 553 F.2d at pp. 888-889, and he may not be deprived of that right absent an affirmative showing of *purpose* to secure delay." (*Fritz* v. *Spalding, supra,* 682 F.2d at p. 784, italics added.)

One will recall that the majority treat defendant's *Faretta* motion as having been made on Friday, March 16, 1984. (See maj. opn. at pp. 78-79.) Moore, on Monday, March 19, 1984, was assigned to a trial department for hearing of pretrial motions, if and when denied, empanelment of the jury was to commence. Trial, i.e., selection of the jury, commenced on March 26, 1987.

In a case decided after *Faretta* had been argued but before it was decided, the Honorable Judge Wachtler in *People* v. *McIntyre* (1974) 36 N.Y.2d 10 [364 N.Y.S.2d 837, 324 N.E.2d 322] made a cogent observation regarding criminal defendants typified by the likes of Chapman, Fritz, Ruiz and Moore herein. He correctly observed: "Frequently, the *pro se* defendant is motivated by dissatisfaction with the trial strategy of defense counsel or a lack of confidence in his attorney [citations]. Disagreement over trial strategy is particularly frustrating to a defendant in light of holdings indorsing counsel's view when a difference of opinion arises [citation]." (*People* v. *McIntyre, supra,* 364 N.Y.S.2d at p. 843.)

Even if we must say that Moore is presumed to know that procedurally the timeliness of his *Faretta* request would be determined on the basis of

California's "within a reasonable time before commencement of trial" standard (see *People v. Windham, supra,* 19 Cal.3d 121, at pp. 127-128), no sound reason exists, I believe, and none is stated in the court's decision today, explaining why the constitutional *Faretta* requests of Fritz and Chapman fared better at law in federal court than Moore's constitutional entitlement fares today under *Windham's* standard. It is manifest that the essential facts bottoming each case are not significantly or meaningfully different so as to account for the disparity. Given the fundamental nature of the *Faretta* right,[2] fundamental fairness compels, I believe, that Moore's *Faretta* right be honored whether implemented by either timeliness standard, federal or California.[3] Thus stems my dissent; whether its premise is firm, I proceed to determine.

The trial setting judge, as we know, on Monday, March 19, 1984, before and after meticulously enumerating express findings, ruled: "Under the authority of People versus Ruiz, 142 Cal. Ap. 3d 780, this motion is denied." *People v. Ruiz, supra,* 142 Cal.App.3d 780 is a leading progeny of *People v. Windham, supra,* 19 Cal.3d 121.

In the *Ruiz* case, the Honorable Justice Hanson (P. D.) reviewed the denial of a constitutional *Faretta* motion made six days before trial. Consequently, the *Ruiz* court was called upon to consider *Windham's* holding, i.e., ". . . that in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to commencement of trial," and *Windham's* footnote 5, set out in the margin.[4] (See *People v. Windham, supra,* 19 Cal.3d 127-128, fn. 5 at p. 128.)

---

[2] The right to defend is personal, i.e., the criminal defendant must be free personally to decide whether the assistance of counsel is to his advantage in a particular case. Respect for the individual's right of free choice, acknowledged to be the lifeblood of the law, mandates that the *Faretta* right be honored. (*Faretta v. California, supra,* 422 U.S. at p. 834 [45 L.Ed.2d at p. 581].)

[3] "A defendant has the moral right to stand alone in his hour of trial. The denial of that right is not to be redeemed through the prior estimate of someone else that the practical position of the defendant will be enhanced through representation by another, or the subsequent conclusion that defendant's practical position has not been disadvantaged." (*United States v. Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1128.)

[4] Footnote 5 of *People v. Windham, supra,* reads as follows: "Our imposition of a 'reasonable time' requirement should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation. We intend only that a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. For example, a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court which should consider relevant factors such as whether or not defense counsel has himself indicated that he is not ready for trial and

*Windham's* holding, as we know, answered the court's question: "[P]rior to what point during pending criminal proceedings must the *constitutional* right of self-representation be asserted if it is to be exercised?" Mr. Justice Blackmun, dissenting in *Faretta* had asked essentially the same question, to wit: "How soon in the criminal proceeding must a defendant decide between proceeding by counsel or *pro se?*" (Dis. opn. of Blackmun, J., in *Faretta* v. *California, supra,* 422 U.S. at p. 852 [45 L.Ed.2d at p. 592].) The *Denno, supra,* court had foreshadowed the logical answer to Justice Blackmun's question when holding in substance that because Maldonado clearly sought to represent himself after his case had been called on the calendar but before the jury had been chosen, he had an unqualified right to have his request granted. The *Denno* court sensibly reasoned that at the time of Maldonado's request, there was no danger of disrupting trial proceedings already in progress. (See *United States* ex rel. *Maldonado* v. *Denno, supra,* 348 F.2d at p. 16.) *Fritz* and *Chapman,* then, are federal circuit cases wherein the constitutional *Faretta* right was implemented on the basis of the right's dimensions delineated in *Denno* as follows: " 'The right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start of the trial. [Citations.] Once the trial has begun with the defendant represented by counsel, however, his right thereafter to discharge his lawyer and to represent himself is sharply curtailed. There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance. [Citations.]' " (*Denno, supra,* 348 F.2d at p. 15; see also *People* v. *Windham, supra,* 19 Cal.3d at p. 126.)

Herein trial had not begun, counsel was of record but Moore was on his own. Fundamental fairness compels that Moore, a criminal defendant, have made known to him his last clear chance to assert his constitutional right. The *Denno* court fixed the "Rubicon," to borrow Judge Goldberg's usage, beyond which the defendant forfeits the unqualified (unconditional) right to

---

needs further time for preparation. Thus if the reason why a defendant makes a request for self-representation under such circumstances simply because the motion is made in close proximity to trial is because he disagrees with his appointed counsel's desire for a continuance, some delay may be necessary whether or not the defendant's motion is granted. In such a case the very reason underlying the request for self-representation supplies a reasonable justification for the delayed motion. Furthermore, as defense counsel himself seeks a continuance for the purpose of further trial preparation it would be illogical to deny a motion for self-representation under such circumstances simply because the motion is made in close proximity to trial. There may be other situations in which a request for self-representation in close proximity to trial can be justified. When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted. When, on the other hand, the defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation without any ability to test the request by a reasonable standard."

defend pro se as being the meaningful commencement of trial proceedings, i.e., the empanelment of the jury. The Honorable Judge Goldberg of the Fifth Circuit, writing on the subject of the court's delineating procedural requirements for asserting the right of self-representation, observed: "In delineating those requirements, courts must consider the fundamental nature of the right and the legitimate concern for the integrity of the trial process. Particular requirements can be justified only insofar as they are functionally related to reconciling those interests." (*Chapman* v. *United States, supra,* 553 F.2d at p. 895.)

*Windham's* reasonable time requirement functions, I think, to reconcile "those interests," but only if trial courts strictly adhere to *Windham's* footnote 5. To be specific, in defendant Moore's case under review, the Master Calendar Judge's reply confirming that it is true under federal law that Moore had a constitutional right to represent himself, should have, in light of *Windham's* footnote 5, concluded thus: "if today I find there is some showing of reasonable cause justifying the lateness of [your] request to proceed pro se without the assistance of appointed counsel who informs this court that he is ready to proceed Monday? So I ask you, Mr. Moore, why have you waited until now, the date scheduled for trial, to make your *Faretta* motion?" Unquestionably, based on the record, Moore would have answered: "Okay, it's all right there in my letter. I didn't make up my mind to ask you to until March 5, when I learned my lawyer did not want me to go co-counsel with him, but my case was continued while I was in the holding cell. So I couldn't ask you, even though my lawyer knew I would if you did not give me the right to go co-counsel. When the same thing happened on March 9, I wrote and mailed you a letter the next day on March 10, telling you what was going on, that is the best I could do under the circumstances. Today, March 16, is the first time since losing all confidence in my lawyer I have had a chance to tell you face to face that I want to exercise my right under federal law to represent myself." (See, *infra,* fn. 7.)

The point, of course, I seek to make aside from illustrating that a record for review should be made, is that under *Windham's* footnote 5, Moore's pretrial *Faretta* motion made in close proximity to the date scheduled for his trial did not in the first instance address the calendar judge's sound discretion.[5] In first instance, after determining that Moore's request

---

[5] Currently, of course, there prevails a contrary analysis of *Windham* and footnote 5 holding as in *People* v. *Hall* (1978) 87 Cal.App.3d 125, at page 131 [150 Cal.Rptr. 628], that a *Faretta* motion made the day before trial or in close proximity forthwith addresses the discretion of the trial judge because the defendant's request was not made within a reasonable time before the commencement of trial. (*Id.,* at p. 132.) Notable is the fact that the *Hall* court did not discuss the factual issue lurking in footnote 5, i.e., whether or not there was some show-

complied with *Faretta's* requirements, the judge, again under *Windham's* standard, was required to make a factual determination as in an order to show cause hearing, i.e., that the proof at hand did or did not constitute "some showing of reasonable cause" for the lateness of Moore's assertion of his *constitutional* pretrial *Faretta* right. On this record, if the calendar judge had expressly found that there was not any showing of reasonable cause justifying the lateness of Moore's *Faretta* request, I would surely hold that such a factual finding was totally contrary to the substantial showing made. Further, I hold that because the showing is uncontradicted that Moore's *Faretta* motion was made at the first practical opportunity afforded him to face the court, at law his motion was bona fide and timely, leaving no room thereafter for the exercise of the calendar judge's discretion other than allotting Moore a reasonable time to prepare for his defense. (*People* v. *Herrera* (1980) 104 Cal.App 3d 167, 174 [163 Cal.Rptr. 435];[6] *People* v. *Cruz* (1978) 83 Cal.App.3d 308, 324-325 [147 Cal.Rptr. 740].)

---

ing of reasonable cause justifying the lateness of the defendant's request. Moreover, when holding in effect that Hall had waived or forfeited his absolute right to represent himself, the *Hall* court, at page 131, acknowledged being guided in part by "dictum" in *People* v. *Potter* (1978) 77 Cal.App.3d 45, 50 [143 Cal.Rptr. 379]. In *Potter,* the court concluded that the defendant's pretrial request on the morning of the day set for trial was *not* unequivocal. Instead of resting its decision on the basis of no proper *Faretta* request, the *Hall* court, in dictum, held there was no Sixth Amendment deprivation because the claimed constitutional *Faretta* right was not made within *Windham's* reasonable time prior to the commencement of trial. Consequently, the *Hall* court, at page 132, reviewed the trial court's exercise of discretion, which it found to be proper, under *Denno* standard and that of *Windham* by adoption, a standard that both *Denno* and *Windham* expressly limited its application to instances of *Faretta* requests made after commencement of trial or midtrial. (See *People* v. *Windham, supra,* 19 Cal.3d at pp. 126, 128.)

In *Ruiz, supra,* 142 Cal.App.3d 780, the court at page 791 held that a constitutional *Faretta* request made three days before start of trial was within *Windham's* footnote 5's "close proximity to trial" and untimely at law because of no showing of any reasonable cause excusing the motion's lateness; consequently, the *Ruiz, supra,* court, at pages 791-792 approved, in accord with *Potter* and *Hall,* standards for trial court discretion initially designated for application to after-start-of-trial or midtrial *Faretta* requests.

Interestingly, the *Hall* court, 87 Cal.App.3d at page 131, referred to the language in *Windham's* footnote 5 as being "dictum." It appears then that trial courts are denying the *constitutional* right of self-representation when requested within a week or less of the date set for trial in the exercise of discretion. Discretion, however, that is in the main based on courts of appeal dictum interpreting *Windham's* dictum. But, of course, in time dictum can become law; the issue, as I see it presently, is whether dictum upon dictum has in effect rendered meaningless the constitutional *Faretta* right of criminal defendants, like Moore, who show a bona fide reason for making a late request within close proximity to trial.

[6] In *Herrera, supra,* 104 Cal.App.3d 167 the court found timely a *Faretta* request made in close proximity to trial but without a request for a continuance to prepare. I quote at page 174 the court's reasoning: "One further factor to be considered is the cause for the lateness of the request [citation]. [¶] Here Herrera's request came immediately on the heels of the trial court's denial of his request to enter an additional plea of not guilty by reason of insanity, a motion that was made first on April 11, 1979, and continued until April 16 at the request of the district attorney. [¶] To hold a motion for self-representation made by a defendant at his earliest opportunity is untimely when that 'earliest opportunity' appears to be shortly before

*Ruiz,* relied upon by the calendar judge in Moore's case as heretofore noted, is a case in point. Factually, Ruiz, like defendant Moore, made his pretrial *Faretta* motion after being denied his *Marsden* motion to relieve counsel. In Moore's instance the calendar judge in addition denied his motion to go cocounsel. Both Ruiz's and Moore's constitutional requests, then, were made late in close proximity to the date scheduled to their trials, i.e., three or six days before in Ruiz's trial depending upon one's assessment of the record, and three days in Moore's instance. And, as heretofore noted, both Ruiz and Moore are classic examples of would-be pro se defendants described hereinabove by Judge Wachtler in *McIntyre.*

Upon reading *Ruiz* at pages 783-787, it clearly appears that the trial judge did not make an express finding that Ruiz's *Faretta* motion was untimely made because the motion could and should have been made much earlier, notwithstanding the prosecutor's argument, citing in support several cases including *Windham,* that the court should so find. (*Ruiz, supra,* 142 Cal.App.3d at p. 785.) Because, I think, he was either unmindful or did not fully comprehend the pivotal significance decision-wise of footnote 5 upon *Windham's* "reasonable time" requirement, the trial judge treated Ruiz's *Faretta* motion as if it addressed in the first and last instance the exercise of the court's sound discretion. I quote from *Ruiz* the trial judge's findings: " '. . . the Court finds that there has been, or nothing has been demonstrated to this Court that Mr. Ruiz is trying to delay the case by these requests, but based upon, and I have reviewed the cases you have cited, and based upon that and the statements regarding the difficulties of the case, the fact of the difficulties of serving this witness and also in conjunction with matters that were taken up in the in camera hearing as related to some of these matters you have mentioned, . . . your request to have Counsel relieved and to proceed representing yourself is denied.' " (*Ruiz,* at p. 786.)

However, under *Windham's* "reasonable time" requirement in light of footnote 5, a criminal defendant's constitutional pretrial *Faretta* motion is

trial, would effectively thwart defendant's constitutional right to proceed in propria persona as established in *Faretta v. California* (1975) 422 U.S. 806 [citation, fn. omitted]."

Interestingly, however, the *Herrera* court, after considering footnote 5, assumed arguendo that Herrera's *Faretta* request was forfeited, i.e., no longer absolute but subject to trial court discretion, because not made within a reasonable time prior to commencement of trial. (104 Cal.App.3d at p. 173.) Interestingly, because the *Herrera* court, by *assuming arguendo* authorized trial courts to employ a balancing factor which the *Windham* court, *supra,* 19 Cal.3d at page 128 specifically instructed to be used in assessing *Faretta* requests made after the commencement of trial, adding as a factor the cause for the lateness of the request. The *Herrera* court's approach prompts the thought that the time is at hand to paraphrase that which Justice Traynor once said of vague criminal statutes, i.e., *Windham's* reasonable time requirement is so vague in light of footnote 5 that people of common intelligence must necessarily guess at its meaning and differ as to its application. (See *People v. McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].)

timely and should be honored as being such albeit made in close proximity to the start of trial when the record made on the motion contains some showing that there is reasonable cause for the lateness of the request. In other words: "When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted." (*People* v. *Windham, supra,* 19 Cal.3d at p. 128, fn. 5.)

Sensing that the trial judge had not initially tested the lateness of Ruiz's request by the "reasonable standard" mandated to the trial court by *Windham's* footnote 5's bottom line, the *Ruiz* court saw its appellate function as follows: "Appellant in a single argument for reversal urges that the trial court erred in denying appellant's motion to proceed in propria persona. [Citations.] Resolution of the issue is dependent upon finding whether the motion was a timely one, requiring the court to grant it if appellant's choice to represent himself was voluntarily and intelligently made. If we find appellant's motion to represent himself to be untimely, we must determine whether the court's denial of his request, based on the need for a continuance, was an abuse of discretion." (*Ruiz, supra,* 142 Cal.App.3d at p. 782.)

The *Ruiz* court found that under the total circumstances known to the trial judge after his full inquiry, Ruiz's *Faretta* motion, made three days before the date of trial, was at law untimely. Consequently, under *Windham's* footnote 5, Ruiz's exercise of his right of self-representation was a matter left entirely unto the trial court's sound discretion. The reason, however, Ruiz's pretrial pro se request was untimely: "Appellant's motion was unaccompanied by any showing of reasonable cause for its lateness." (*Ruiz, supra,* 142 Cal.App.3d at p. 791.)

At page 787, after noting that Ruiz's *Faretta* motion followed on the heels of a denial of his motion to substitute counsel, the *Ruiz* court early hinted its ultimate holding, I quote: "The *Faretta* motion also was founded on appellant's perception that his attorney was not investigating adequately appellant's defense theory and on their disagreements over tactics. The record allows the inference that this was not a new thought upon the part of appellant, but appellant offered no excuse for failing to bring the motion earlier." But, of course, an inference must be reasonably drawn from a fact supported by substantial evidence and not mere speculation. Quoting, then, *Ruiz* again: "The requirement of timeliness is to avoid unjustifiable delay or disruption of orderly court proceedings. Here, even though the trial judge expressly found there was no evidence that appellant had brought the motion for the *purpose* of delay, the manner in which the motion was brought and the reasons for making it show that disagreements had developed between appellant and his attorney over investigative efforts and trial tactics. Appellant had been in the local jail for three and one-half months and,

obviously, his disapproval of the defense tactics chosen by his attorney did not arise just six days before trial." (*Ruiz, supra,* at p. 791.)

However, whether *Ruiz* was correctly decided or not is not my present concern. The *Ruiz* court's analysis determining footnote 5's teaching is indisputably sound. Given the *Ruiz* court's determination that the record lacked some showing of reasonable cause justifying the lateness of Ruiz's *Faretta* motion, so be it.

I do find it provocative, however, that the *Ruiz* court informed Ruiz at 142 Cal.App.3d at page 788, footnote 3 as follows: "Federal cases such as *Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782, 784, and *Chapman* v. *United States* (5th Cir. 1977) 553 F.2d 886, 894-895, hold that a *Faretta* motion is timely as a matter of law if made before trial, unless the trial court finds the motion was made for purposes of delay. We decline to follow these cases in light of the language of *Windham*."

As I see it, in one sense meaningful the *Ruiz* court's application of the "language of *Windham*" did result in the *Ruiz* court following *Fritz* and *Chapman*. As we have noted, the *Ruiz* court concluded at law that which the trial court neglected to find as a fact, i.e., that Ruiz's *Faretta* motion was untimely made because its lateness was not justified by any showing of reasonable cause. In sum, Ruiz's motion could have and should have been made at an earlier date, as contended by the prosecution. However, the *Fritz* court at 612 F.2d at pages 784-785, set out instructions for trial courts' use when determining whether a *Faretta* request is a tactic to secure delay: "The court must also examine the event's preceding the motion, to determine whether they are consistent with a good faith assertion of the *Faretta* right and whether the defendant could reasonably be expected to have made the motion at an earlier time."

To no one's surprise, I would think, it develops, then, that the lower court's federal standard, and *Windham's* footnote 5 standard, both implementing the federal constitutional *Faretta* right, are, when properly applied, flip sides of the same coin reflecting from a different perspective the same legitimate concern, i.e., that the *Faretta* right be asserted in good faith and not for the purpose of delay, which is *Fritz's* concern; and to disallow "misuse [of] the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice," which is the expressed concern of *Windham's* footnote 5.

In defendant Moore's case at bench under automatic review of a judgment of death by execution, I think it cannot reasonably be disputed that the Master Calendar Judge did not initially undertake to factually deter-

mine whether the lateness of Moore's *constitutional Faretta* request was or was not justified by good and sufficient cause. This fact is evidenced by the fact that the calendar judge's findings are silent without an express finding that Moore's assertion was untimely made. And, of course, this court cannot in this instance find from a silent record that the calendar judge impliedly found Moore's motion to be untimely made. From a silent record, it is unthinkable that this court would, in effect, find that Moore lost, forfeited or waived exercise of his fundamental right of self-representation because it was not timely asserted. The fundamental right of self-representation is coextensive with the Sixth Amendment right to the assistance of counsel requiring of the court, I believe, that it indulge every presumption against waiver of both fundamental rights. (*Johnson* v. *Zerbst, supra,* 304 U.S. at p. 464 [82 L.Ed.2d at p. 1466].)

As we know, the record is not silent as regards Moore's attempts to waive the right to the assistance of counsel. On this record, not once but thrice Moore knowingly, intelligently and unequivocally attempted to no avail to waive his right to the assistance of counsel, i.e., on Friday, March 16, on Monday, March 19, and in the trial department before commencement of trial on March 26, 1984, in accord with *Faretta*. As regards the timeliness of Moore's *Faretta* assertion, however, the calendar judge as previously noted made no inquiry directed to determining whether reasonable cause did or did not exist justifying the lateness of his assertion.[7] Notwithstanding the

---

[7] In light of the majority's view (see maj. opn., *ante,* at p. 81), I have rereviewed the pretrial record made in the Master Calendar Court. Respectfully, but no less vehemently, I disagree, finding no reasonable basis for the majority's assertion that the trial court soundly reasoned that granting Moore his right of self-representation implemented by a continuance would interfere with orderly administration of justice and prejudice the prosecution. In my view of the record finding therein a *substantial showing of reasonable cause for the lateness of the request* (*Windham's* fn. 5), it follows that the Master Calendar Court erroneously denied Moore's timely made at law *Faretta* request. The reasons expressed by the calendar court, then, are essentially irrelevant. But even assuming arguendo *Hall* court analysis, (see dissent, fn. 5), I would find the trial court's reasons infirm. Manifestly, Moore's motion invoking his *Faretta* right and a reasonable continuance came at time when there was no danger of disrupting pretrial and trial proceedings already in progress. The reasonable delay incident to Moore's requests would not have served to obstruct the orderly administration of justice; however, it would have assured the fair administration of justice by honoring Moore's fundamental right of personal choice. Moreover, surely a trial department would have opened during the reasonable delay.

The trial court did not expressly find that to "grant" would prejudice the prosecution. Based on this record, an implied finding is not warranted. To be sure, the deputy district attorney represented that three out-of-state law enforcement witnesses indispensable but solely for Moore's pretrial motions would experience "extreme hardship" relative to reconciling their competing vacation schedules. However, the trial court was advised that the witnesses were "on call ready to come in within a day's notice of the time we are actually sent out to trial." Moreover, it clearly appears of record that the prosecutor's concern was that he "might [not] again be so fortunate to marshal them again together in the distant future." But of

court's oversight, the record contains not just "some" but a substantial showing of reasonable cause justifying the lateness of Moore's *Faretta* request. Examination of the Clerk's Transcript reveals that on January 23, 1984, Moore's cause was called for trial but continued to March 5, 1984, at defense counsel's request because as he stated: "The reason for the continuance is it's a death penalty case, and I'm just simply not ready to try the case today. There are some documents that are needed by both the People and myself from out of state, both the State of Kansas and Colorado. I believe I've gotten most of the documents from those states, and I'm certain I don't have all of it."

The prosecution and Moore agreed to the court's continuance of the trial date to March 5, when to Moore the court explained: "You have already waived time to today, and today is the 40th day. If you agree to this further continuance for Mr. Slick to prepare your defense, March 5th will also be the 40th day; giving us the same 20 days to bring you to trial as we have today. Do you understand this, sir?"

Eventually, Moore replied "yes," he understood and his counsel told the calendar judge that he believed he would be ready next time. The Clerk's Transcript reveals, however, that on March 5, the prosecutor assigned to try Moore's case was "unable to announce ready" and Moore's counsel's one word response was "fine." On Friday, March 9, 1984, however, it developed that the prosecutor was still engaged in a murder trial and Moore's counsel was "about to go out on this John Carroll case." Consequently, the calendar judge aged Moore's case, "51 of 60" days, and continued it until March 16, 1984, which brings us to Friday's hearing. It bears noting at this point that on Monday, March 19, 1984, the Master Calendar Judge opened the proceedings stating: "Mr. Moore, we are here to continue the matter that we started last Friday. Which now is reduced to a request by you to proceed in propria persona. [¶] You have filled out the four-page form entitled 'Petition to Proceed in Propria Persona' which the Court will order filed."

---

course, Moore was not seeking a continuance "in the distant future," nor was he entitled to one.

Finally, strikingly opposite to the facts in *Fritz,* defendant Moore's pretrial conduct is shown of record to be faultless, in no way causing the prior delays or continuances granted at the request of the prosecution and Moore's counsel when announcing they were not ready to proceed. And, of course, when assigned defense counsel did state he was "ready for trial," Moore justifiably disagreed. Counsel's pretrial investigation of the witness, Jones, was neither adequate nor complete. (See maj. opn., *ante,* p. 75, fn. 3; compare with 1 ABA Standards for Criminal Justice, std. 4-4.1; see Approved Draft 1971, pp. 225-228, 231.) Moreover, one can hardly say realistically that the defense is "ready" if a defendant has already parted ways with his appointed counsel. (*Chapman* v. *United States, supra,* 553 F.2d at p. 895; see also pp. 891-895.)

During Friday's hearing, of course, the calendar judge, in a courtroom cleared of all spectators and the prosecutor, discussed at length Moore's letter to the court dated March 10, 1984, reproduced in footnote 2, typed majority opinion, page 74.

The showing made to the calendar judge during Friday's hearing, then, was before the calendar court during Monday's *Faretta* hearing. Ultimately, all will agree, the time came during the *Faretta* hearing requiring the calendar judge to decide the timeliness of Moore's assertion. Indulging every presumption against waiver of fundamental rights, the only reasonable inference to be drawn by the calendar judge from the record at hand is that Moore, if present, would have on March 5 and 9, engaged the court in discourse essentially no different than that of March 16 and 19, ultimately invoking his *Faretta* right. However, as we know, Moore remained, through no fault of his own, in a holding cell on March 5 and 9, under any analysis as an accommodation to otherwise engaged counsel for both parties to the lawsuit. If, however, Moore had been afforded his reasonable expectation to be present enabling him to address the court, his *Faretta* request would have been timely under *Windham's* standard. Footnote 5 clearly instructed the calendar judge that if defense counsel seeks a continuance it would be illogical to deny Moore's motion for self-representation simply because the motion is made in close proximity to trial. On March 5, we have noted, it was the prosecutor that moved for the continuance, but *Windham's* logic would be no less applicable on March 5 as it would be to defense counsel's motion affording him a continuance on March 9, 1984.

Moreover, on this record, the showing made on March 16 to the calendar judge is that March 5 is the earliest date that Moore decided that if he was not granted cocounsel status, he would unequivocally invoke his *Faretta* right. On this record, the showing is that it would not be reasonable to expect or the calendar judge to reason or find that Moore could have and should have asserted his *Faretta* right on or before January 23, 1984, or anytime thereafter until March 5, 1984. Moore's letter is certainly *some* showing, I believe substantial, that before January 23, and until March 5, Moore's personal choice was limited to proceeding as cocounsel with the consent of his appointed attorney. At no time during the hearing did appointed counsel refute that for months prior to March 5, he held Moore at bay while he thought about it. Reasonably, then, Moore would not assert his *Faretta* right before March 5, because he had no reason to so do. There is no showing of record that his attorney counseled with Moore between January 23 and March 5, 1984. Moore's written word describing his state of mind during the period of time before March 5 must be viewed as credible and undisputed. Consequently, during the period January 20 through March 5, the actual "disagreement over trial strategy" Judge Wachtler

wrote about had not as yet occurred. The showing before the calendar judge is that on January 20 as far as Moore knew his counsel was competently investigating his case to the end of preparing an adequate defense. Moore at the time wanted only to equally share with his counsel the defense's strategy decisions as a consequence of the investigation. In other words, during the period of investigation, Moore uncounseled and properly not released on bail was left in the dark, so to speak, and therefore had no choice but to cherish the fundamental right to the assistance of counsel. How it came to be, however, that on March 5, the trust and confidence requisite to the attorney-client relationship reached its irreparable breaking point in Moore's instance, the calendar court learned during colloquy with Moore and from reading his letter explaining his plight. Unlike the record in Ruiz's case, then, the showing made in the calendar court admits of a finding that going pro. per. was a new thought as of March 5, when, as the letter shows, Moore's attorney asked him if he wanted to go pro. per. Moreover on March 16 and 19, again unlike Ruiz's, Moore's constitutional *Faretta* request was accompanied by an affirmative substantial showing of reasonable cause for its lateness in close proximity to trial.

Consequently, the Master Calendar Judge's express findings (see maj. opn., p. 78), as I assess them, simply reflect his concern that an old case calendar-wise should go out to trial because counsel are finally ready, showing little regard for Moore's constitutional right to proceed pro se. At times from reading the record, my sense is that the calendar judge would have granted Moore his *Faretta* right if Moore had not needed time to prepare. Under *Windham's* footnote 5, however, Moore's request was timely asserted. Unquestionably, at law, then, Moore should have been granted a reasonable time to prepare to defend. Fundamental fairness rejects the notion that Moore's exercise of his *Faretta* right turns on his willingness not to prepare his own defense. (*People* v. *Morgan* (1980) 101 Cal.App.3d 523, 527-529 [161 Cal.Rptr. 664]; *Armant* v. *Marquez* (9th Cir. 1985) 772 F.2d 552, 558.)

Respectfully, I would reverse the judgments; and because I would, I abstain from discussing defendant Moore's remaining contentions on appeal. On this record, the majority's holding denies defendant Moore a right thought and implicitly said to be his by the Framers of the Bill of Rights. As I see the record, the *Windham* court had defendant Moore's case in mind when in footnote 5 the court instructed that the "reasonable time" requirement must not be used as a means of limiting a defendant's constitutional right of self-representation. The *Windham* court understood that justice is offended when a procedural rule designed to insure that criminal defendants reasonably exercise their right of self-representation is used to prevent them from exercising the right, particularly when the showing is made that the right was requested at the earliest practical opportunity to

directly address the court after deciding to request exercise of the right. In any event, I believe that the lifeblood of the law, i.e., respect for the individual, requires of this court's majority, if not a federal court, that before judgment is executed, defendant Moore be informed of the date before which his *Faretta* right would not have been held untimely, i.e., forfeited or deemed waived at law. I, of course, have concluded, in light of the record, that defendant Moore did not forfeit or waive his constitutional right to act as his own lawyer at trial because he timely asserted his right, i.e., the record substantially shows reasonable cause justifying the lateness in close proximity to trial of his request. Further, the Master Calendar Judge abused discretion when denying Moore, without due consideration, a reasonable time to prepare his choice of defense strategy. Therefore, the judgments, I hold, should be reversed.

Appellant's petition for rehearing was denied January 9, 1989, and the opinion was modified to read as printed above. Arguelles, J., and Eagleson, J., did not participate therein.