[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III, V, VI, and VII of the DISCUSSION.
OPINION
In this case, we discuss a number of issues arising out of the convictions of a 36-year-old man who used Internet chat rooms to solicit sex with 13-year-old girls.
 A jury convicted defendant Michael Richardson of sending or exhibiting harmful matter to a minor (count 1; Pen. Code, § 288.2, subd. (b); undesignated section references are to the Penal Code); attempting to commit a lewd act with a child under 14 (count 2; §§ 288, subd. (a), 664); annoying or molesting a minor (count 4; § 647.6, subd. (a)); and possessing methamphetamine (count 5; Health Saf. Code, § 11377, subd. (a)). The jury hung on count 3 (annoying or molesting a minor), and the trial court declared a mistrial on that count.
 The trial court sentenced defendant to a total state prison term of five years four months, consisting of four years (the upper term) on count 2, eight months consecutive on count 1, and eight months consecutive on count 5, with a six-month concurrent term on count 4.
 Defendant contends: (1) Insufficient evidence supports his conviction on count 1 because there is no evidence the material exhibited was harmful. (2) The trial court erred reversibly as to count 1 by instructing the jury that the People did not need to prove the material was harmful. (3) The trial court erred reversibly as to count 1 by failing to give a unanimity instruction. (4) Insufficient evidence supports defendant's conviction on count 2 because the evidence showed his actions were ambiguous and constituted mere preparation, not attempt. (5) The trial court abused its discretion by denying defendant's motion to discharge appointed counsel. (6) The trial court abused its discretion by denying defendant's motion to represent himself. (7) Defendant's upper term sentence is unconstitutional in light of Cunningham v. California
(2007) 549 U.S. ___ [166 L.Ed.2d 856, 127 S.Ct. 856] (Cunningham.) Agreeing only with the last contention, we shall affirm defendant's convictions and remand the matter to the trial court for resentencing.
 FACTS Counts 1 through 4 sprang from online conversations between defendant and the victims, "Jane Doe" (counts 2 4) and "Mary Roe" (counts 1 3), on the night of April 8, 2004. Defendant had made Mary Roe's online acquaintance earlier, but the police did not learn that until after they had arrested defendant for his conduct toward Jane Doe. *Page 793 
Jane Doe
 On April 8, 2004, 13-year-old Jane Doe and her family were visiting her grandparents in Las Vegas. Around 10:00 p.m., Jane was sitting with her cousin in her grandparents' house, exchanging instant text messages (IM) with a friend through the Yahoo! Internet service. Jane's Yahoo! profile showed that her screen name, "invader_tabbz," belonged to a 13-year-old girl living in Roseville.
 A pop-up message appeared on Jane's screen from "supersmartguy2004," who claimed to be Mike from Roseville, aged 29. Mike asked if Jane wanted to "meet up" that night.
 This message made Jane uncomfortable. She knew she was not supposed to exchange IM's with strangers and felt her privacy had been invaded. Calling the message "weird," she showed it to her cousin, then turned over the conversation to her.
 Jane's cousin, posing as Jane, asked Mike how he got her screen name; Mike answered that he got it from the "member directory." Soon afterward the cousin asked Jane's stepfather, S.G., to intervene.
 "[F]lustered" and scared, Jane told S.G. that "some guy" who knew where she lived had tried to contact her. S.G. sat down at the computer and told her to leave the room. He then carried on the conversation as Jane, meanwhile telephoning the Roseville Police Department and getting advice on "what kind of information to solicit." After finishing the conversation with "supersmartguy2004," S.G. faxed or e-mailed a hard copy to the police.
 According to the hard copy, "supersmartguy2004" tried to set up a liaison with "invader_tabbz," whom he believed to be a 13-year-old girl named Kathy. He asked her, "have you ever made out before?" When "she" said she had, he replied, "so lets makeout[.]" He instructed her to sneak out and meet him at a nearby 7-Eleven so they could go back to his place for that purpose. He said he would be driving a "lil black 2 door" with "chrome rims" and gave her a cell phone number.[1] He also said he would be wearing a black T-shirt and jeans; at his request, "Kathy" promised to wear a skirt. *Page 794 
 Roseville Police Sergeant Bergstrom advised the police dispatcher about what to tell S.G. Bergstrom suggested the 7-Eleven which S.G. (as Kathy) and defendant picked as the place to meet at 12:30 a.m. on April 9, 2004. After getting a description of the suspect, his clothing, and his car, Bergstrom deployed officers to watch the 7-Eleven and to arrest the suspect if he showed up.
 Roseville Police Officer Wernli, parked near the 7-Eleven in an unmarked car, saw a black car park in the lot around 12:20 a.m. Defendant, wearing a black T-shirt and jeans, went into and out of the store, got back in his car, and drove off.
 Roseville Police Officer Buelow, on assignment with Officer Wernli, got out of their car for a better view from what he believed to be a shadowed spot. He saw defendant walking around in the store and making a purchase, then heard defendant's car "rapidly accelerating" as it left. Buelow later realized the spot he had stood in was well lit and defendant might have observed him.
 At 12:22 a.m., Sergeant Bergstrom learned that the suspect's car was leaving the 7-Eleven. He got behind the speeding car, then stopped and arrested defendant, its sole occupant.
 Sergeant Bergstrom determined the car was registered to defendant at an address on Sunrise Boulevard in Roseville, just a few miles away. Searching the car, on the backseat the officers found a paper bag containing a bottle of Mike's Hard Lemonade and a box of Trojan condoms. Officer Wernli confirmed that the 7-Eleven stocked those items. The 7-Eleven's surveillance videotape showed defendant entering the store at 12:16 a.m. on April 9, 2004, and standing at the counter at 12:18 a.m.
 Later on April 9, 2004, Roseville Police Detective Walstad searched defendant's residence and seized a computer, which he turned over to the high tech crimes task force for forensic analysis. Sacramento County Sheriff's Detective Dale Lee, a member of the task force, examined the computer's hard drive.
 Lee determined the computer was used by Yahoo! subscriber "Mike," whose screen names included "supersmartguy2004" and "mikeys20032003." Four photographs of a White male adult, printed from the computer, were identified as depicting defendant. *Page 795 
 A Yahoo! subscriber can identify and view subscribers' profiles by gender, age, and location, although he cannot be sure the information is accurate because the subscriber provides it and Yahoo! does not verify it. "Mike" had viewed profiles of users purporting to be females under 18, including "invader_tabbz."[2]
 A search on the computer for "invader_tabbz" revealed an IM conversation between a person using that name and defendant, beginning around 10:49 p.m. on April 8, 2004. The conversation was identical to the one S.G. sent the Roseville police.
 Mary Roe
 People's exhibits 37 and 38 showed an IM dialogue between defendant and "ascension_into_lies," profiled as a 13-year-old girl living in Sacramento (Mary Roe), on March 7, 2004, and March 19, 2004. On March 7, he introduced himself and asked if she wanted to "fuck tonight seriously," but got no response. On March 19, he asked if she wanted to meet "right now tonight no bullshit"; she answered, "not really," since she did not know him and he was "probably too old." She also said she did not feel like "sneaking out" and she had a boyfriend.
 People's exhibit 33 showed Mary Roe's Yahoo! profile, including her photograph, which defendant had viewed. People's exhibits 35 and 36 showed this and other photographs of Mary Roe, found on defendant's hard drive along with a photograph of a White adult male.[3]
 People's exhibit 32 showed 58 pages of further IM conversation between defendant and Mary Roe on April 8, 2004, beginning around 3:32 p.m. and ending shortly before he contacted Jane Doe.
 Mary Roe testified about this evidence. In March and April 2004, she was a 13-year-old Yahoo! subscriber using the screen name "ascension_into_lies." She remembered at least three IM conversations with "supersmartguy2004" *Page 796 or "mikeys20032003." She ignored his first message, thinking "it was just some random person that was trying to harass" her; she felt the same way about the second message. However, on April 8, she engaged in a prolonged and sexually suggestive discussion with defendant.[4]
 During this conversation, defendant said he would like Mary "passed out naked" on his "bedroom floor"; though she felt "harassed," she did not end the discussion. She told him she was "not even old enough to get a work permit"; he answered, "oh shit ok." She sent him photographs of herself; he said, "hey you look good." She told him she was wearing a skirt, underwear, a bra, and a tank top; he responded, "oh yeah" and "im liking that skirt thing." She said, "Having sex in a skirt." He gave her his cell phone number and told her to call him.
 Later, defendant said he wanted to take her "panties off play with you HI pussy while you give me those big lips on my you know then I fuck that wet little pussy k," then added, "hows that sound"; she replied, "Very good." He reiterated that he wanted "to just hike that skirt and get busy." He also asked if they could "just park somewhere and do it in my car huh?"
 During a one-hour break in the IM conversation, defendant called Mary on the phone and tried to engage in "phone sex" with her. She did not reciprocate.
 At another point, defendant and Mary further discussed sex acts. He asked her if she liked "it from behind or from the front or does it matter" and said, "bet you get wet really easy huh"; she replied, "Yeah." He added, "just think we couldve been doing it right now[.]" He explained he liked "the top thing" and "to see a grl play with herself for me a lil first and spreads herself open for me to do you know wat i mean"; she said she did. He followed up: "omg I'm getting hornier i really want to hike up your skirt take your panties off and go inside you right now though would you like that?"; she answered "mmhmm." He asked if she was "getting wet at all right now." He asked if she liked "it slow or hard and fast" and added, "lil of both huh"; she answered "yep." He said he wanted "to suck those sweet tits of yours chew on your lips to mmm."[5]
 Defendant then tried to talk Mary into sneaking out and meeting him. She answered, "maybe," adding, "night er escapades are a lot harder to pull off *Page 797 than day ones." He offered to pick her up near home, saying she would not "be gone all that long you know." Apparently sensing reluctance, he accused her of playing "some kind a game or something"; she replied it was "not a game," her parents were home, she was "under high alert and all," and did not want to "face the consequences." He asked when they went to bed; she said "no set bedtimes."
 Uncharged acts
 Sacramento County Sheriff's Detective Dale Lee also testified about other IM conversations on the computer between defendant and apparently underage females. Hard copies were introduced as exhibits.[6]
 People's exhibit 20 showed an IM conversation between defendant and "mllefloride," profiled as a 16-year-old girl, around 7:00 p.m. on March 6, 2004. Defendant asked if she wanted to "fuck tonight maybe." She responded, "illegal"; he replied, "so." She asked if he wanted to be arrested; he said, "sure im not scared." She said she was "only 14, and my dads a cop"; he said he "always wanted to do a cops lil girl." He asked her to sneak out and meet him because he wanted "some hot young sweet pussy I could eat for awhile." He explained he preferred to "pick up" girls on the Internet because they are "way sweet compared to bars."
 People's exhibit 16 showed IM's defendant sent to "blink_chicka_182," profiled as a 15-year-old girl. Ultimately identifying himself as a 29 year old in Roseville, he contacted her on four different dates from March 12, 2004, to April 5, 2004, repeatedly asking to get together and "make out" or "fuck maybe." He asked if she was a virgin and said he "really want[ed]" her. She never responded.
 People's exhibit 20 showed IM's defendant sent to "bammawuvsyou," profiled as a 16-year-old girl living in Roseville, on three dates beginning January 2, 2004, and ending February 12, 2004. The first time he asked her to let him give her a "full body massage with warm passion fruit lotion all over"; the second time he asked if she could come over that night; the third time he said he sought a "cute girl" who wanted to "fuck no strings no bullshit games im serious reply if your interested in hearing more[.]" She never responded. *Page 798 
 People's exhibit 17 showed an IM defendant sent to "babkitz," profiled as a 16-year-old girl living in Sacramento, on February 12, 2004, confiding that he "really want[ed] to get laid tonight." She did not respond.
 People's exhibit 21 showed an IM dialogue between defendant and "ilikeitinthebutt05," profiled as a 16-year-old girl living in Rocklin, over the period January 13, 2004, to February 8, 2004. On January 13, defendant wrote that she had a "nice sn"; she replied, "haha." On January 14, defendant told her he "really want[ed]" her, invited her to "come over," and let her know he wanted "to do you somewhere not just the but"; she did not respond then, or on January 23 or February 1. His February 4 promise to "give it to you inthebut if you want" did not improve his luck; nor did his February 6 invitation to come see him at his house. On February 8, he asked her to meet him sometime soon; she replied that she did not know him and asked his age; he invited her to look at his profile. She said she was 15; he said he was 29.
 People's exhibit 19 showed IM's defendant sent to "flutterbyes01," profiled as a 16-year-old girl living in Roseville, over the period February 22, 2004, to April 9, 2004. On February 22, introducing himself as a 29 year old living in Roseville, he asked if she wanted to meet that night; on February 24, he asked if they could "meet and just fuck"; on February 26, he hoped to be her "teddy bear forever"; on February 29, he asked her to marry him; on March 7, he asked her to meet him that night to "fuck"; on April 9, he again asked her to meet that night. She never responded.
 Other evidence
 While searching defendant's home, in a desk drawer Detective Walstad found a plastic bag containing a substance which proved to be a usable amount of methamphetamine, along with a "methamphetamine pipe" and defendant's expired driver's license.
 Defendant did not testify or put on evidence.
 DISCUSSION I Defendant contends his conviction on count 1 must be reversed for insufficiency of the evidence because the People failed to prove that the matter he sent to Mary Roe was harmful. We do not agree. *Page 799 
 Section 288.2, subdivision (b), provides: "Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense. . . ."
 Section 313, subdivision (a), provides: "`Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." (Italics added.)
 The trial court instructed the jury on "harmful matter" pursuant to Judicial Council of California Criminal Jury Intructions (2006) CALCRIM No. 1140 as follows:
 "You must decide whether the material at issue in this case meets the definition of harmful material. Material is harmful if when considered as a whole:
 "1. It shows or describes sexual conduct in an obviously offensive way.
 "2. A reasonable person would conclude that it lacks serious litera[r]y, artistic, political, or scientific value to minors, and
 "3. An average adult person applying contemporary statewide standards would conclude it appeals to prurient interests.
 "A prurient interest is [a] shameful or morbid interest in nudity, sex, or excretion.
 "Material as used in this instruction means any printed or written material or any photograph or other pictoral representation.
 "Applying contemporary statewide standard[s] means using a present-day standard and determining the effect of the material on all those whom it is likely to reach within the state; in other words, its impact on the average *Page 800 person in the statewide community. The average adult person is a hypothetical person who represents the entire community, including both men and women, religious and nonreligious people, and adults of varying ages, educational and economic levels, races, ethnicities, and points of view.
 "The contemporary statewide standard means what is acceptable to the statewide community as a whole and not what some person or persons believe the community ought to accept. The test you must apply is not what you find offensive based on your personal, social, or moral views. Instead, you must make an objective determination of what would offend a statewide community as a whole.
 "You may consider evidence of local community standards in deciding what [the] contemporary statewide standard is. However, you may not use the standard of a local community by itself to establish the contemporary statewide standard.
 "The material is not harmful unless a reasonable person would conclude that taken as a whole it lacks serious literary, artistic, political, or scientific value. When deciding whether the material is harmful, do not weigh its value against it[s] prurient appeal.
 "The depiction of sexual activity by itself does not make the material harmful. In order for material depicting sexual activity to be harmful, it must meet the requirements for harmful material that I just defined for you."
 Defendant asserts in his opening brief that the evidence was insufficient on this count because the People did not put on any evidence of the relevant "contemporary statewide standard" and the instructions would not have cured that problem; in his reply brief, he adds that only expert testimony can make the required showing. These arguments fail because the Legislature has already defined the "contemporary statewide standard" applicable to this case.
 Defendant, aged 36 on April 8, 2004, believed Mary Roe to be 13 (as she was). He sent her message after message urging intercourse and oral copulation, among other sexual acts. In other words, in almost every message he proposed the commission of a felony: lewd and lascivious conduct with a minor under the age of 14 (§ 288, subd. (a)).[7] *Page 801 
 Section 288 was enacted over a century ago (Stats. 1901, ch. 204, § 1, p. 630) "to protect children from the lustful advances and tamperings of callous and unscrupulous persons as well as from the assaults of depraved unfortunates." (People v. Hobbs (1952) 109 Cal.App.2d 189, 192 [240 P.2d 411] [§ 288, subd. (a), not restricted to "obscene" acts].) The people of the State of California, acting through their Legislature, have thus determined that conduct which comes within this statute is "harmful" as a matter of law. While the "contemporary statewide standard" applicable to the offense of "send[ing] . . . harmful matter . . . to a minor" might need clarification in some cases, this is not one of them.
 Because count 2 charged defendant with attempting to violate section 288, subdivision (a), as to Jane Doe, the trial court instructed the jury on what acts come within that statute.[8] As to count 1, in which defendant proposed to do the kinds of acts criminalized by section 288, subdivision (a), to acquit defendant the jury would have had to find that there was nothing wrong with a 36-year-old man proposing to perform such acts with or upon a 13-year-old child. A rational jury could not have made that finding. The fact that defendant proposed that a 13-year-old-girl commit felony violations of section 288 is substantial evidence that the matter communicated was harmful according to contemporary statewide standards.
 We note, however, that in future cases charging a violation of section 288.2, subdivision (b), where the defendant's communications with the minor propose the commission of one or more felonies, the jury should be instructed that California's felony statutes establish the "contemporary statewide standard" applicable to the charged offense. *Page 802 
 II Defendant contends the trial court erred prejudicially by instructing the jury on count 1 that the People need not prove the matter defendant sent was harmful. We conclude defendant has not shown prejudice.
 As mentioned above, the trial court instructed on this count pursuant to CALCRIM No. 1140. The written
instruction (which was sent into the jury room) states in part: "The People must prove that the defendant knew the character of the material but do not need to prove that the defendantknew whether the material met the definition of harmfulmaterial." (Italics added.) However, in reading the instruction the court inadvertently omitted a phrase, telling the jury: "The People must prove the defendant knew the character of the material but do not need to prove thematerial met the definition of harmfulmaterial."[9] (Italics added.)
 Defendant tacitly concedes the written instruction was correct, but asserts the erroneous oral instruction nevertheless could have prejudicially confused the jury; he also claims the error is reversible per se. We disagree with both points.
 Where the trial court misinstructs the jury on one element of an offense, the error is not grounds for per se reversal. Rather, the beyond-a-reasonable-doubt harmless error standard of Chapman v. California (1967) 386 U.S. 18,24 [17 L.Ed.2d 705, 707, 87 S.Ct. 824] applies. (People v.Cox (2000) 23 Cal.4th 665, 676-677 [97 Cal.Rptr.2d 647,2 P.3d 1189]; People v. Flood (1998) 18 Cal.4th 470,479-480 [76 Cal.Rptr.2d 180, 957 P.2d 869].) This standard is satisfied here.
 "[M]isreading instructions is at most harmless error when the written instructions received by the jury are correct. (People v. Osband (1996) 13 Cal.4th 622, 687
[55 Cal.Rptr.2d 26, 919 P.2d 640].)" (People v. Box
(2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130] (Box).) Citing several cases, defendant asserts incorrectly that the Box rule applies only when the differences between oral and written instructions "are not significant" or involve only "minor discrepancies." Defendant has misread these cases.
 People v. McLain (1988) 46 Cal.3d 97
[249 Cal.Rptr. 630, 757 P.2d 569] merely states, without drawing any conclusion, that the oral and written versions of the instructions given were "not significantly different" (id. at p. 111, fn. 2). People v. Andrews
(1989) 49 Cal.3d 200 [260 Cal.Rptr. 583, *Page 803 776 P.2d 285] cites the broad general rule without adding that it applies only if the discrepancies are minor. (Id. at pp. 215-216.) People v. Garceau
(1993) 6 Cal.4th 140 [24 Cal.Rptr.2d 664, 862 P.2d 664] cites not only People v. Andrews, for the general rule, but also People v. Heishman (1988)45 Cal.3d 147 at pages 163 through 165 [246 Cal.Rptr. 673,753 P.2d 629], where the trial court, by omitting "not" from an instruction, orally gave the jury the wrong rule of law. (People v. Garceau, supra, 6 Cal.4th at pp. 189-190.) Finally, People v. Murillo (1996) 47 Cal.App.4th 1104
[55 Cal.Rptr.2d 21], is simply inapposite: the trial court failed to read an instruction it had told the parties it would read and the record did not show that the jury had consulted the written copy provided. (Id. at p. 1107.)
 Because defendant's authorities do not create any exception to the Box rule, that rule applies here. The (correct) written instructions control.
 Furthermore, they should control because the oral instructions were confusing and self-contradictory. As noted in part I, the trial court orally gave an extended definition of "harmful material" and the standard by which to judge its harmfulness. The court also duly instructed that the People had the burden of proving every element of every charged offense beyond a reasonable doubt. But the court's oral misstatement contradicted this instruction. Standing alone, the oral instruction on this issue would have left the jury unclear about the burden of proof. The written instruction, by contrast, correctly told the jury defendant did not need to know the material met the legal definition of harmfulness, but did not purport to lower the People's burden of proof.
 Finally, assuming the discrepant instructions could have confused the jury, the arguments of counsel would have cleared up the confusion. The prosecutor spelled out the elements of count 1, including the definition of "harmful material," and stated she had to prove defendant sent harmful material but did not have to prove defendant knew the material was harmful. Defense counsel told the jury every element of each offense had to be proven beyond a reasonable doubt, then in turn spelled out the elements of count 1, including the definition of "harmful material." In conjunction with the written instructions, these statements of counsel correctly informed the jury of the applicable law.
 The trial court's oral misstatement was harmless beyond a reasonable doubt.
 III* Defendant contends the trial court erred prejudicially as to count 1 by failing to give a unanimity instruction. He reasons: (1) he communicated with Mary Roe on March 7, 2004, and March 19, 2004, as well as on April 8, 2004; (2) the instructions said the crime took place "on or about or between [sic] April 8 and April 9, 2004"; (3) the court told the jury the People were "not required to prove the crime took place exactly on or between those dates, but only that it happened reasonably close to those dates"; (4) March 7 and March 19 are "reasonably close to" April 8; (5) therefore, the jury might have erroneously thought it did not have to agree that the culpable communications took place on April 8. The contention fails.
 A unanimity instruction is required when the evidence shows a larger number of offenses than were charged, unless the prosecution has elected a specific criminal act or event on which it relies, or the defendant's acts formed a continuous course of conduct. (People v. Whitham (1995)38 Cal.App.4th 1282, 1295; People v. Jenkins (1994)29 Cal.App.4th 287, 299; People v. Avina (1993)14 Cal.App.4th 1303, 1309.)
 At the start of her closing argument, the prosecutor asked rhetorically: "What happened on April 8th and April 9th of 2004?" Later, she said as to count 1: "[T]his count is directed specifically at the'ascension_into_lies' conversation on April 8thof 2004." (Italics added.) In rebuttal, she added that the relevant time period for all the charged offenses began at "3:32 in the afternoon on April 8th" — when defendant's conversation with Mary Roe began — then specified that defendant "had an almost six-hour conversation . . . with `ascension_into_lies'" which "goes to our harmful matter[.]" In other words, the prosecutor elected the acts at issue; the jury could not have understood count 1 to include the March 2004 conversations. And as to the April 8 conversation, defendant's course of conduct was continuous. Thus, no unanimity instruction was required. *Page 804 
 IV Defendant contends his conviction on count 2 (attempted lewd and lascivious act on child under 14) must be reversed because there is insufficient evidence that he went beyond mere preparation. We disagree.
 A crime of attempt includes the specific intent to commit the underlying crime and a direct but ineffectual act beyond mere preparation toward committing that crime. (People v. Toledo (2001) 26 Cal.4th 221, 230
[109 Cal.Rptr.2d 315, 26 P.3d 1051]; People v. Herman
(2002) 97 Cal.App.4th 1369, 1385 [119 Cal.Rptr.2d 199] (Herman).) Where the defendant's intent is clear, only slight acts in furtherance of that intent are required to prove attempt. (Herman, supra,97 Cal.App.4th at p. 1388, citing People v. Memro (1985)38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446].) There is no bright line between mere preparation and overt acts toward the commission of the crime; but the clearer the intent to commit the crime, the less need to prove acts proximate to the consummation of the offense and the more likely that steps in the early stages of its commission will constitute the required overt act. (Hatch v. Superior Court (2000)80 Cal.App.4th 170, 188-189 [94 Cal.Rptr.2d 453] (Hatch).)
 In cases involving attempted violation of section 288, subdivision (a), a variety of actions have been found sufficient to prove a direct but ineffectual act toward the commission of the crime. For instance, in Hatch, supra,80 Cal.App.4th 170, "[the defendant's] Internet communications with Lisa, whom he believed to be 13, described several forms of sexual conduct in which they could engage when they had the opportunity. He stated during their . . . Internet communication setting up their meeting later that day that he did not want to meet with her just to talk; and, while sitting together at the pool, he showed her pictures of himself nude and discussed what sexual activities he was planning. While harboring the specific intent to molest 13-year-old Lisa, Hatch tried to convince her to accompany him into his truck, and when Lisa later followed him to his truck, he again tried to convince her to enter the truck. These acts went beyond mere preparation for sexual molestation and constituted immediate steps in the present execution of the criminal design." (Id. at p. 188.)
 Here, defendant described over the Internet sexual conduct in which he proposed to engage with 13-year-old Jane Doe, set up a meeting to occur as soon as possible after their conversation, described his car and the manner in which he proposed they dress, drove to the meeting place at the proposed time, and bought items (hard lemonade and condoms) apparently meant to facilitate the planned offense. This course of conduct went far beyond mere preparation and encompassed every step defendant could have taken toward *Page 805 committing the intended crime. The fact that he could not have committed it because Jane Doe had not really been talking to him and would not be meeting him that night is immaterial, as factual impossibility is not a defense to crimes of attempt. (Hatch, supra,80 Cal.App.4th at pp. 185-186.)
 According to defendant, all of the above evidence of attempt is negated by the fact that he left the 7-Eleven at 12:22 a.m., eight minutes before the designated meeting time. He admits that an officer testified defendant might have spotted him standing outside his police car, but asserts, "no viable argument will lie" that the jury could have inferred that was why defendant hightailed it out of the parking lot at 70 miles per hour. On the contrary, as that is the only reasonable inference to explain defendant's sudden flight, we presume the jury drew that inference. Furthermore, defendant cites no authority holding that after a defendant has committed a series of overt acts toward the commission of a crime, including arrival at the planned crime scene, he can show his intent was ambiguous or establish a defense to attempt simply by fleeing.
 The only California case defendant cites in his favor is People v. La Fontaine (1978) 79 Cal.App.3d 176
[144 Cal.Rptr. 729] (La Fontaine) (disapproved on another point in People v. Lopez (1998) 19 Cal.4th 282,292 [79 Cal.Rptr.2d 195, 965 P.2d 713]). La Fontaine
held that where a defendant picked up a minor and offered money for a sexual act, but the minor got out of the defendant's car and left, the defendant's verbal solicitation of a lewd and lascivious act amounted to mere preparation and did not constitute an attempt to commit the crime. (LaFontaine, supra, 79 Cal.App.3d at pp. 179-183.) As defendant acknowledges, later decisions on point have either distinguished La Fontaine or flatly rejected its holding. (See, e.g., Herman, supra,97 Cal.App.4th at pp. 1385-1392; Hatch, supra, 80 Cal.App.4th at p. 188;People v. Ansaldo (1998) 60 Cal.App.4th 1190,1196 [71 Cal.Rptr.2d 283].) Even assuming for the sake of argument that La Fontaine remains good law, it is inapposite because defendant did far more than verbal solicitation.
 The evidence was sufficient to prove defendant's guilt on count 2.
 V-VII* V Defendant contends the trial court abused its discretion by denying his pretrial Marsden motion (People v. Marsden (1970) 2 Cal.3d 118). We disagree.
Background
 On April 28, 2006, defendant moved in limine to discharge his appointed counsel.[10] He told the trial court he believed counsel had failed to address "multiple statutorial [sic] and Constitutional violations involved in this case," in particular the police officers' "violations of Penal Code 118.1, 118.8, and Penal Code of 129 [sic][.]" He asserted further that he had motions to vacate and to dismiss for insufficient evidence which counsel had also failed to address, that several Marsden motions had been denied already, and that "the conflict attorney misled me into believing that that was an attorney instead of just a conflict attorney, okay?" He asked the court to vacate the current trial date or continue the matter to consider his motion to dismiss. He also mentioned he had filed a motion for declaratory relief.[11]
 When the trial court inquired into these points, defendant asserted the officers had perjured themselves and made false statements in their police reports, evidence had been illegally seized from his residence, and there had been no probable cause to arrest him, but counsel had not brought these issues up at the preliminary hearing because he had been induced to waive it. Defendant also asked to file another motion to continue the case, to "vacate," and "to dismiss all the evidence as insufficient," which he had already served on the district attorney. Defendant said he had tried to discuss this motion with counsel, but "there's been a conflict between me and her. I have a problem communicating with her. And there's been multiple — she's attempted multiple times to actually address certain parts of the issues that I want addressed, but pertaining to — the relevant facts have not been addressed to the original arrest."
 In response, counsel acknowledged "a lot of disagreements" with defendant and "difficulty communicating[,]" but stated that these problems were partly due to interference by an outsider who was purporting to give defendant legal advice. She had advised him not to file motions or make statements and to preserve his Fifth Amendment rights; however, he was "trying to kind of educate himself in the law" and insisted on filing his motions. She had not argued many of his issues because she thought his theories lacked legal support.
 Defendant denied that anyone in particular was advising him, but admitted he had "joined a law group on the Internet" and had been "relentlessly researching the issues of law and jurisprudence in the United States[.]" On further discussion, defendant admitted that someone in particular had been trying to advise him, but claimed he had disregarded that person's advice.
 The trial court ruled: "What's before the Court at this time, sir, you've asked the Court [to] discharge an attorney, and it's unclear to me if you wanted substitution of new counsel or precisely what you're asking for; but based on what's before the Court today, the Court finds that there is insufficient evidence to establish that there is irreconcilable conflict or that otherwise Counsel is not providing adequate representation, so your motion is denied."
Analysis
 The trial court should grant a Marsden
motion only if the record clearly shows counsel is not providing adequate representation or that defendant and counsel have become so embroiled in conflict that ineffective representation will likely result. Where the court has denied aMarsden motion after giving the defendant a full opportunity to explain the grounds for the motion, we review the court's ruling only for abuse of discretion and will find such an abuse only where the defendant has shown that the failure to replace appointed counsel would substantially impair defendant's right to assistance of counsel. (People v. Barnett
(1998) 17 Cal.4th 1044, 1085; People v. Moore (1988)47 Cal.3d 63, 76.) We see no abuse of discretion here.
 Defendant and his counsel disagreed about tactics, a matter as to which trial counsel is "captain of the ship." Such disagreement does not show an irreconcilable conflict. (People v. Welch (1999) 20 Cal.4th 701,728-729.) Defendant admitted that he and counsel had discussed the issues he wanted raised and that counsel had tried to raise some of them; thus, there was no breakdown in communication. Finally, counsel's refusal to parrot defendant's attempts at legal reasoning or to let outsiders interfere with the attorney-client relationship shows that she was determined to provide him proper representation, whatever obstacles he might throw up. The trial court did not abuse its discretion by refusing to discharge her on this showing.
 VI Pointing to the trial court's uncertainty about whether defendant actually sought to represent himself, he asks us in the alternative to construe his Marsden motion as a Faretta motion (Faretta v. California (1975)422 U.S. 806 [45 L.Ed.2d 562]) and to find that the court abused its discretion by denying the purported Faretta motion. We decline to do so.
 As defendant admits, a Faretta motion must be clear and unequivocal, and a Marsden motion does not necessarily imply a Faretta motion. (People v. Rivers (1993) 20 Cal.App.4th 1040, 1051, fn. 7; see People v. Crandell (1988) 46 Cal.3d 833,854-855.) Defendant asserts that because he had made aFaretta motion at some earlier stage, hisMarsden motion of April 28, 2006, should be taken to imply a Faretta corollary. We disagree. Unequivocal means unequivocal. Nothing in the Marsden colloquy we have quoted above suggests, let alone unequivocally states, defendant's desire to represent himself at that time.
 VII Defendant contends his upper-term sentence on count 2 is unconstitutional in light of Cunningham,supra, 549 U.S. ___ [166 L.Ed.2d 856]. We agree.
 The trial court sentenced defendant to the upper term based on two aggravating factors found by the court: the sophistication and planning of his crime, and the lack of remorse or compassion he had shown afterward.Cunningham has made clear that any facts which could enhance a defendant's sentence beyond the middle term (except facts related to prior convictions) must be tried to the jury (unless defendant waives jury trial) and found true beyond a reasonable doubt. The aggravating factors cited by the court are not related to any prior convictions. Thus, we must vacate defendant's sentence and remand the matter to the trial court for resentencing.
 Within 30 days of the filing of our remittitur, the District Attorney shall elect whether to try aggravating factors to a jury (unless waived by defendant) or to stipulate to imposition of the middle term. If the District Attorney chooses the latter course, the trial court shall recalculate defendant's sentence on all counts accordingly. *Page 806 
 DISPOSITION Defendant's convictions are affirmed. Defendant's sentence is vacated and the matter is remanded to the trial court for further proceedings in light of part VII of this opinion.
 Morrison, J., and Robie, J., concurred.
[1] The parties stipulated that this number belonged to defendant at the address where he lived on April 8, 2004, and that he was then 36 years old.
[2] Around 140 Yahoo! profiles were found on the computer. Only seven were listed as aged 13 or 14, but 27 or 28 were "underage."
[3] Mary Roe was clothed in all of the photographs, but some were "sexually suggestive." One showed her upper body clothed only in a bra, while another showed her raising her skirt to expose her panties.
[4] She did not explain why she responded differently this time, but testified that the conversation "didn't really mean anything, that it was harmless."
[5] Around that time, he also asked if Mary's dad was "still up"; she said, "Yep."
[6] Except for the conversations with Mary Roe, which gave rise to the charged offenses, this evidence was admitted under Evidence Code sections 1108 and 1101, subdivision (b).
[7] Section 288, subdivision (a), provides: "Any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony. . . ."
[8] The court instructed pursuant to CALCRIM No. 1110 as follows:
"[T]he crime of committing a lewd or lascivious act on a child under age 14 is committed when:
"1. The defendant willfully touched any part of the child's body on the bare skin or through the clothing, or the defendant willfully caused the child to touch her own body, the defendant's body, or the body of someone else, either through the bare skin or through the clothing.
"2. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child, and
"3. The child was under the age of 14 years at the time of the act.
"The touching need not be done in a lewd or sexual manner. Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required for lewd and lascivious conduct. It is not a defense that the child may have consented to the act."
[9] Defendant does not suggest that the trial court deliberately changed the instruction, and the record shows that the court and counsel did not discuss it.
* See footnote, ante, Page 790.
* See footnote, ante, Page 790.
[10] Defendant made other such motions both before and after this date, but he does not raise a claim of error as to those motions. Accordingly, although the People devote much space in their brief to the prior motions, we do not discuss them.
[11] Counsel acknowledged she had received a copy of this motion from the prosecutor's discovery, along with "many" other filings by defendant, and noted that was how she usually got such documents. *Page 807